**MILLER BREWING COMPANY,**
Appellant (Defendant
Below),

v.

**BEST BEERS OF BLOOMINGTON,**
**INC., Appellee (Plaintiff Below).**

No. 53S01–9302–CV–222.

Supreme Court of Indiana.

Feb. 11, 1993.

Stephen W. Terry, Ronald D. Gifford, Baker & Daniels, Indianapolis, Gary Clendening, Harrell, Clendening & Coyne, Bloomington, for appellant.

James R. Cotner, Ronald L. Chapman, Karen A. Wyle, Cotner Andrews Mann & Chapman, Bloomington, for appellee.

## ON PETITIONS TO TRANSFER

KRAHULIK, Justice.

This case involves the interpretation of *Ind.Code Ann.* § 7.1–5–5–9 (*West* 1982) ("Termination Statute") pertaining to the termination of an agreement between a brewer and a wholesaler. Miller Brewing Company ("Miller") (Appellant–Defendant below) seeks transfer after the Court of Appeals affirmed the award of compensatory damages in favor of Best Beers of Bloomington, Inc. ("Best Beers") (Appellee–Plaintiff below). *Miller Brewing Co. v. Best Beers of Bloomington, Inc.* (1991), Ind.App., 579 N.E.2d 626. In addition, Best Beers seeks transfer from that portion of the opinion vacating an award of punitive damages entered in its favor. Several issues are raised in the petitions, which we restate as follows:

(1) Whether the trial court erred in refusing Miller's tendered instruction on the Termination Statute;

(2) Whether the Court of Appeals erroneously interpreted the Termination Statute;

(3) Whether punitive damages are appropriate in this breach of contract action; and

(4) Whether the admission of an irrelevant document constituted reversible error.

The facts most favorable to the verdict were set out in the opinion of the Court of Appeals, including that court's footnotes 1, 2 and 3, as follows:

Miller Brewing Co. is a Wisconsin corporation which brews a variety of beers. It distributes its products in Indiana through independent distributors who sell the products to various retail outlets. Best Beers had been a Miller distributor since it first entered into a distributorship agreement with Miller in 1950. Under the 1950 agreement, and all the subsequent distributorship agreements between the parties, Best Beers was given the nonexclusive right to sell Miller products in certain designated counties.

Under the 1983 distributorship agreement, Miller gave Best Beers the primary responsibility for distributing various Miller products in Monroe, Brown, and Owen counties. Miller could neither give Best Beers the exclusive right to sell its products in these counties nor demand that Best Beers distribute only Miller products[1], however, because Indiana law prohibits exclusive distributorships. Because of Miller's inability to grant exclusive distributorships, other Miller distributors could, and did, distribute Miller products in the counties assigned to Best Beers.[2]

---

[1] In addition to Miller products, Best Beers distributed various Anheuser–Busch, Stroh, G. Heileman, and LaBatt beers. Miller did not grant Best Beers the right to distribute all of the Miller product lines; it gave another Bloomington distributor, Monroe Beverage Co., the right to distribute its most popular product, Miller Lite.

[2] The practice of distributing beer outside of the assigned distributorship counties is known as transshipping.

Best Beers proved to be a satisfactory distributor of Miller products for over thirty years. From the inception of the distributorship until 1984, Best Beers never received less than a satisfactory rating from Miller. In 1984, however, the previously good relationship between Miller and Best Beers began to sour.

In January of 1984, Miller made Nancy Catalane its local area manager. At first

Catalane rated Best Beers' performance as adequate, but within a few months she began to issue a series of highly unfavorable distributorship evaluations and memoranda. These unfavorable evaluations and memoranda charged Best Beers with a variety of ills including alleged mismanagement and an inability to keep overage beer out of the market, alleged acts of personal misconduct committed by one of Best Beers' senior employees, alleged attempts by Best Beers' employees to convince retailers not to stock Miller High Life, and alleged failures of Best Beers' sales personnel to adequately market Miller product lines.

In late 1984, one of Best Beers' prime competitors, Monroe Beverage Co., sent a letter to Miller in which Monroe Beverage intimated that Miller High Life should be added as a companion brand to Miller Lite in an "all MILLER distributorship." (Record, p. 6293). At the time, Monroe Beverage was the Miller Lite distributor in the area.

Between 1984 and 1986, Best Beers' sales of Miller High Life continually declined. In 1986, Best Beers' sales of High Life increased modestly. Best Beers' decrease in sales paralleled a nationwide decrease in the popularity of Miller High Life.

Between 1980 and 1987 sales of High Life in cans and bottles decreased by almost two thirds, from 21,557,569 barrels in 1980 to 7,829,760 barrels in 1987. At the same time, marketing of draught High Life rose and then declined slightly, from 1,810,912 barrels in 1980 to 1,271,-859 barrels in 1987. During this time, Best Beers' Miller High Life sales were equivalent to or better than the national average.

Best Beers had to contend with some difficulties in sales that were caused by Miller. In the eighties, Miller chose to emphasize Lite in its advertising while de-emphasizing High Life. In addition, Miller refused to supply Best Beers with adequate point-of-sale (p.o.s.) advertising materials while complaining that Best Beers did not maintain adequate p.o.s. materials in its retail markets. Miller also refused to fill orders from Best Beers in the manner requested by Best Beers. In many instances, Miller would not send the products Best Beers requested in the quantities requested. This caused Best Beers to be overstocked on some product lines and understocked on others.

In general, the retailers with whom Best Beers dealt were pleased with its performance. Some retailers, including one which had at one time attempted to pay Best Beers with twenty to thirty thousand dollars worth of bad checks, did, at Miller's request, lodge complaints with Miller concerning Best Beers. The three written complaints in Miller's file concerning Best Beers were all drafted in July of 1985, apparently in response to a request from a high level Miller employee.

In October of 1986, Miller sent Best Beers a preliminary notice of termination. This notice informed Best Beers that Miller intended to terminate the distributorship agreement because of a host of alleged deficiencies in Best Beers' performance:

1) failure to aggressively market the allotted Miller product lines by failing to rotate stock in retail accounts, failing to provide merchandising services and product delivery to retail accounts, and failing to comply with marketing plans and commitments made to Miller;

2) failure to maintain a balanced inventory by being periodically out of stock on some product lines and not stocking others;

3) failure to maintain quality control by failing to observe code-date requirements, failing to properly rotate stock in the warehouse, vehicles, and retail locations, failing to prevent overage beer from reaching customers, failing to retrieve overage beer from retailers, failing to replace overage beer in the retail outlets, and failing to destroy overage beer when found;

4) failure to attend Miller training programs or to offer on site training programs;

5) failure to preserve Miller's good will by failing to participate in community activities, failing to convey a positive image of Miller products to retailers, and failing to "maintain a cooperative, positive attitude" toward Miller and its employees;

6) failure to provide regular deliveries to retailers;

7) failure to ensure proper placement, installation, and display of Miller p.o.s. materials in retail locations; and, finally,

8) failure to cooperate with and be friendly to Miller employees, failure to provide Miller with information upon Miller's request, and failure to implement an alcohol awareness program in Best Beers' primary territory.

Best Beers attempted to keep overage beer off of its retailers' shelves and attempted to remove beer which passed the date restriction while on the retailers' shelves. Despite its efforts, Miller representatives found overage beer in some retail accounts which were normally serviced by Best Beers. At the time the overage beer was found in the market, transshippers were also actively selling in the area.[3] Although Best Beers was not obligated to dispose of overage beer sold by transshippers under the distributorship agreement, Catalane attempted to force Best Beers to remove and destroy beer sold by transshippers. Miller did not make any attempt on its own to remove overage beer sold by transshippers.

---

[3] As noted in a Miller communication, transshipping tended to make quality control in a market more difficult because transshippers are not as concerned about maintaining quality controls outside their primary territory.

Best Beers took several steps to remedy the defects alleged by Miller in the termination letter. The distributor formulated a cure plan. It hired new sales personnel to concentrate on Miller products. It drafted new forms for tracking overage beer and sought the cooperation of retailers in combatting the overage beer problem. It sought to provide Miller with whatever additional information Miller requested. None of these efforts placated Miller.

Following an extended period during which Best Beers attempted to cure its alleged deficiencies, Miller terminated the distributorship agreement. shortly thereafter, Miller awarded the distributorship to Monroe Beverage, a distributor whose performance was equivalent to, and in some ways inferior to, that of Best Beers. In awarding the distributorship to Monroe Beverage, Miller succeeded in consolidating all of its product lines in a single local distributor.

579 N.E.2d at 630–32. Best Beers filed an action seeking compensatory and punitive damages for wrongful termination of the Distributor Agreement. Miller asserted a counterclaim against Best Beers seeking compensatory damages for Best Beers' failure to comply with all of the requirements of the contract. The trial court entered judgment on the jury's verdict awarding compensatory damages of $397,852 and punitive damages of $1,989,260 to Best Beers and nothing to Miller on its counterclaim. Miller appealed. The Court of Appeals affirmed the award of compensatory damages. It also affirmed Best Beers' entitlement to punitive damages in theory, but because of what the court considered to be the prejudicial admission of financial information on Miller's parent company, the case was remanded for a new trial to redetermine the amount of punitive damages. 579 N.E.2d at 643. On transfer, Miller seeks a new trial on the issue of compensatory damages and judgment in its favor on the punitive damages claim. Best Beers urges us to affirm the trial court judgment awarding both compensatory and punitive damages.

### 1. Tendered Instruction Was Properly Rejected

Miller claims that the trial court erred in refusing Miller's tendered instruction on the Termination Statute, *Ind. Code* § 7.1–5–5–9. Final Instruction No. 8 pertaining to the Termination Statute reads as follows:

At all times relevant to this lawsuit, there was in full force and effect an

Indiana statute which read in relevant part as follows:

It is unlawful for ... a brewer ... who sells beer to a permittee ... for ... resale within this state to:

(2) cancel or terminate an agreement or contract between a beer wholesaler and a brewer for the sale of beer, unfairly and without due regard for the equities of the other party.

Miller's tendered instruction quoted the statutory language in a manner similar to the court's instruction, but added the following two paragraphs:

[para. 2] This statute does not, however, supersede the plain language of the Distributor Agreement.

[para. 3] Thus, if you find that Best Beers has failed to substantially comply with any obligation under the Distributor Agreement, then you may find that the contract has been fairly terminated.

■ In determining whether it is error to refuse a tendered instruction, we consider (1) whether the tendered instruction correctly states the law, (2) whether there is evidence in the record to support giving the instruction, and (3) whether the substance of the instruction is covered by other instructions. *Peak v. Campbell* (1991), Ind., 578 N.E.2d 360, 361.

The first paragraph of the tendered instruction was covered by the one given. Similarly, the content of paragraph 3 of Miller's tendered instruction was covered by other instructions. Final Instruction No. 3 instructed the jury, in part, that Best Beers could recover on its complaint only if it proved that it had substantially complied with each and every obligation under the Distributor Agreement; Final Instruction No. 7 informed the jury that a party breaches a contract when he fails to substantially perform all the obligations he agreed to undertake; and Final Instruction No. 9 provided that under the Distributor Agreement, Miller had the right to terminate the contract with Best Beers if Best Beers failed to substantially comply with any obligation set out in paragraph 4 of the Distributor Agreement.

■ Paragraph 2 of Miller's tendered instruction is not a correct statement of the law. The Distributor Agreement provided that: "The laws, rules and regulations of the jurisdiction in which Distributor conducts its business are hereby incorporated in this Agreement to the extent that such laws, rules and regulations are required to be so incorporated and shall supersede any conflicting provisions of this Agreement." Miller relies on *BeerMart, Inc. v. The Stroh Brewery Co.* (1986), 7th Cir., 804 F.2d 409, for the proposition that the Termination Statute does not supersede the plain language of the Distributor Agreement. In *BeerMart*, the wholesaler sought to enjoin the brewer from terminating their agreement after the wholesaler was discovered fraudulently repackaging outdated beer in an attempt to resell the mismarked product as fresh. The district court granted the wholesaler's request for a preliminary injunction, which was reversed on appeal. Miller points to the statement in the opinion of the Seventh Circuit that "the district court erroneously construed the Termination Statute to supersede the plain language of the agreement," *Id.* at 411, as the basis for paragraph 2. Such a statement was not central to the holding in *BeerMart* because the court went on to conclude, in the context of the wholesaler's fraudulent conduct, that the brewer was justified in terminating the contract. *Id.* The Seventh Circuit opinion also noted that faced with intentional unlawful conduct by a wholesaler, there could be no legal support for prohibiting the termination of the wholesaler. *Id.* at 412. Although we do not disagree with the court's conclusion that by committing fraud, the wholesaler deserved termination and, therefore, the brewer was justified in terminating the contract, we do not read *BeerMart* to stand for the bare proposition asserted by Miller here. A brewer may not circumvent the Termination Statute by contract. Accordingly, Miller has not established that the trial court erred in refusing the tendered instruction.

■ Miller also argues that the jury was given no guidance in applying the "vague concepts" of "fairness and equity"

to this case and, therefore, Miller was left subject to each juror's personal whims in determining whether Miller complied with the Termination Statute. Miller correctly notes that it is the trial court's duty to instruct the jury so it can fairly understand the law as it should be applied to the facts of the case. *See e.g. Board of Comr's of Miami Cty. v. Klepinger* (1971), 149 Ind. App. 377, 387, 273 N.E.2d 109, 115. It is also true that, generally, the trial court should "define in the instructions technical and legal phrases in connection with material issues of the lawsuit if properly requested to do so." *Conder v. Hull Lift Truck, Inc.* (1982), Ind., 435 N.E.2d 10, 18. However, we do not perceive that the concepts of fairness and equity are of such a technical nature. In any event, the instruction tendered by Miller does not define these words either. Jury instructions based on abstract statements of the law do not necessarily constitute reversible error. *See Cato Enterprises, Inc. v. Fine* (1971), 149 Ind.App. 163, 176, 271 N.E.2d 146, 155–56. We do not perceive that the jury was confused or misled by the instructions given.

We find no error in the trial court's refusal of Miller's tendered instruction.

### 2. *Statutory Interpretation*

Miller asserts that the Court of Appeals erroneously (1) interpreted the Termination Statute to require more than a good faith basis for terminating a contract between a brewer and a beer wholesaler and (2) decided that the Termination Statute indicates that something more than mere adherence to the terms of the Distributor Agreement is required. We conclude that no error occurred at trial.

The Termination Statute, *Ind.Code* § 7.1–5–5–9, provides in pertinent part:

It is unlawful for a beer wholesaler or a brewer in this state, or a brewer or other person located outside this state who sells beer to a permittee in this state for the purpose of importation and resale within this state to:

&ast; &ast; &ast; &ast; &ast; &ast;

(2) cancel or terminate an agreement or contract between a beer wholesaler and a brewer for the sale of beer unfairly and without due regard for the equities of the other party.

At common law, under general contract principles, the slightest breach of the contract, no matter how trivial or unintended, may be the basis for an action for breach of contract. *Restatement of Contracts* §§ 314 & 317 (1932). However, the Termination Statute subjects contracts between wholesalers and brewers to an additional requirement not applicable to general contracts by prohibiting the termination of a contract "unfairly and without due regard for the equities of the other party." We find no direct statement by the legislature of the purpose behind the Termination Statute. The only published decision of an Indiana state court interpreting this statute suggests that the purpose was to avoid the potential waste of human and equipment resources that might result if either wholesalers or brewers were able to terminate their contracts at will. *Joseph Schlitz Brewing Co. v. Central Beverage Co.* (1977), 172 Ind.App. 81, 104, 359 N.E.2d 566, 581. We also note that the legislature's general statement of purpose in regulating alcoholic beverages is to protect the economic welfare of the people of Indiana, *Ind.Code* § 7.1–1–1–1(a), which would include concern for the orderly distribution of alcoholic beverages.

Miller acknowledges that under the Termination Statute, it is "unlawful" to terminate an agreement "unfairly and without due regard for the equities of the other party," but maintains that the only requirement imposed by the statute is that the brewer have a good faith basis to terminate the agreement. Miller posits that any breach of the Distributor Agreement by Best Beers makes the termination valid under the terms of the contract, and if the termination is valid under the contract, then it must be "fair" within the meaning of the Termination Statute. Therefore, Miller concludes, the Court of Appeals erred in holding that the Termination Statute "indicates that more than mere adherence to the terms of the agreement is required." 579 N.E.2d at 635.

Even if we were to agree with Miller that the Court of Appeals erroneously interpreted the Termination Statute, Miller would not be entitled to a new trial. The essence of Miller's position at trial was that, given the terms of the Distributor Agreement and Best Beers' alleged lack of compliance with those terms, Miller was justified in terminating Best Beers. That was the issue litigated at trial which the jury decided against Miller. The jury did not receive instructions reflecting the two statements of the Court of Appeals to which Miller now assigns error. In the previous section, we held that the trial court did not err in refusing Miller's tendered instruction on the Termination Statute. Similarly, here there is no basis upon which to conclude that Miller did not receive a fair trial on account of language in an opinion from a court on review of which the jury was not informed. Inasmuch as resolution of the issue raised by Miller has no effect on the outcome of this case and the opinion of the Court of Appeals is vacated by our grant of transfer, we need not address whether the Court of Appeals properly interpreted the statute. Suffice it to say that the evidence was sufficient to allow the jury to decide whether Miller breached its contract and the jury was adequately instructed on the law. The jury's verdict finding a breach of contract and awarding compensatory damages was legally proper.

### 3. *Punitive Damages*

Miller next attacks Best Beer's entitlement to punitive damages. We reverse the grant of a new trial on punitive damages because Best Beers failed to meet its burden of proof for punitive damages in this breach of contract case.

■ Opinions of this Court have consistently stated the general rule that punitive damages are not allowed in a breach of contract action. *Lawyers Title Ins. Corp. v. Pokraka* (1992), Ind., 595 N.E.2d 244, 250; *Bud Wolf Chevrolet, Inc. v. Robertson* (1988), Ind., 519 N.E.2d 135, 136; *Travelers Indem. Co. v. Armstrong* (1982), Ind., 442 N.E.2d 349, 362; *Art Hill Ford, Inc. v. Callender* (1981), Ind., 423 N.E.2d 601, 602; *F.D. Borkholder Co., Inc. v. Sandock* (1980), 274 Ind. 612, 616, 413 N.E.2d 567, 570; *Hibschman Pontiac, Inc. v. Batchelor* (1977), 266 Ind. 310, 314, 362 N.E.2d 845, 847; *Vernon Fire & Casualty Ins. Co. v. Sharp* (1976), 264 Ind. 599, 607, 349 N.E.2d 173, 183. Such statements suggest that there are exceptions to this rule, but upon close examination of the opinions of this Court, we find that no exceptions have ever been applied. Today we hold that, in fact, no exception exists.

The notion that in some instances punitive damages are available for a breach of contract appears to have begun in *Vernon Fire & Casualty v. Sharp*, 264 Ind. 599, 349 N.E.2d 173. In that case, plaintiff sued his insurer for breach of an insurance contract, and the jury awarded compensatory damages for the breach. Plaintiff also alleged tortious conduct on part of the insurer for refusing to pay policy proceeds admittedly due, and was awarded punitive damages. In addressing whether punitive damages were available when a breach of contract was proven, this Court noted the general rule that such damages are not recoverable because a plaintiff is "not entitled to mulct the promisor in punitive damages" for a breach of contract. 264 Ind. at 608, 349 N.E.2d at 180. The Court reasoned that such damages were not legally appropriate because (1) "the well-defined parameters of compensatory and consequential damages which may be assessed against a promisor who decides for whatever reason not to live up to his bargain lend a needed measure of stability and predictability to the free enterprise system," and (2) the promisee will be compensated for all damages proximately resulting from the promisor's breach. 264 Ind. at 607, 349 N.E.2d at 180. The Court acknowledged, however, the widely-recognized principle that where the conduct of the breaching party independently establishes the elements of a common law tort, and where the proven tort is of the kind for which punitive damages are allowed, then punitive damages may be awarded. *Id.* In such a case, however, the punitive damages are awarded for the tort, and not for the breach of contract. The majority then found that the *Vernon Fire* plaintiff had

established the elements of the common law tort of fraud and affirmed the award of punitive damages. 264 Ind. at 617, 349 N.E.2d at 184.

In spite of its conclusion that the plaintiff had established the elements of fraud as an independent tort, the majority proceeded to opine that the requirement of an independent tort was not very compelling "when it appears from the evidence as a whole that a serious wrong, tortious in nature, has been committed, but the wrong does not conveniently fit the confines of a pre-determined tort" and where "the public interest will be served by the deterrent effect punitive damages will have upon future conduct of the wrongdoer and parties similarly situated." 264 Ind. at 608, 349 N.E.2d at 180 (emphasis omitted). Such language has been cited in subsequent Indiana cases addressing the availability of punitive damages in a breach of contract action.

In reaching this conclusion, the court relied upon *Sedgwick on Damages*, which was cited in an early Indiana case, *Taber v. Hutson* (1854), 5 Ind. 322. We do not find this authority persuasive. As Justice Prentice wrote in his dissent to *Vernon Fire:*

Coming now to the majority statement that an independent tort is not a prerequisite to an award of punitive damages, the statement is not supported by case law. The majority has stated that a careful review of the case law leads to that conclusion, but it has cited no cases. Instead it cites *Corbin on Contracts* and *Sedgwick on Damages*. The quotation from 5 *Corbin*, § 1077 does refer to punitive damages in " * * * cases that contain elements that enable the court to regard them as falling within the field of tort or closely analogous thereto" indicating that only tort elements, as opposed to a tort or tortious conduct would be required. I believe this is an unfortunate and erroneous inference. The section quoted from. is not a treatise upon the law of punitive damages in contract actions. Rather, it is a pronouncement that such damages are not recoverable for breach of contract, with the caveat that there are certain exceptions. A detailed enumeration of the exceptions and their interplay between certain actions that are a mixture of tort and contract was not required in the context of this portion of the treatise, and I believe the quoted statement was casual and unguarded. At any rate, none of the cases cited in the footnote support the inference. On the contrary, it appears that in each case cited and in which punitive damages were allowed, there had been a tort committed and not merely unsavory conduct.

The quote from *Sedgwick* was taken from *Taber v. Hutson* (1854), 5 Ind. 322, 325, as disclosed by the majority opinion. That case, however, was not a contract case but was one for assault and battery and false imprisonment. The quotation from *Sedgwick* was quite appropriate in that case. The formulation from *Sedgwick* obviously was related to tort cases. The word "mingle" accented in the majority opinion refers not to the mingling of the elements of fraud, malice, etc. in contract controversies but in tort controversies. The author, it appears was explaining that punitive damages are not allowable in all tort cases but only in those also embodying the especially reprehensible elements.

\* \* \* \* \* \*

That evidence of tortious conduct, an independent tort, and not merely of "tort-like" conduct is a prerequisite to an award of punitive damages in contract actions is borne out by an abundance of cases, and we have been cited to none to the contrary.

264 Ind. at 632–35, 349 N.E.2d at 194–95.

Although the notion that punitive damages are available in contract actions where there is "tort-like" conduct has been cited in all cases of this Court which address the issue of punitive damages since *Vernon Fire* was decided, in fact, such an exception has never been applied by this Court. Instead, where punitive damages were affirmed in a breach of contract case, this Court has found evidence of an independent tort. For example, in *Bud Wolf Chev-*

*rolet, Inc. v. Robertson* (1988), Ind., 519 N.E.2d 135, 137, this Court found that "the jury could have found by clear and convincing evidence both (1) that Bud Wolf's conduct, even if not proven to be malicious, nevertheless constituted fraud, gross negligence or oppressiveness" where a car dealer sold an automobile as "new" when, in fact, the automobile had been damaged in a collision. In *Art Hill Ford, Inc. v. Callender* (1981), Ind., 423 N.E.2d 601, 604, this Court found there was "cogent and convincing proof"[1] that the defendant car dealership "engaged in intentional wrongful acts constituting misrepresentation, fraud, gross negligence and oppressive conduct" in completing repairs on a vehicle purchased by defendant. In *F.D. Borkholder Co., Inc. v. Sandock* (1980), 274 Ind. 612, 617, 413 N.E.2d 567, 570, a majority of this Court found "cogent and convincing proof" that the defendant building contractor "engaged in intentional wrongful acts constituting fraud, misrepresentation, deceit, and gross negligence" by constructing a building with latent deviations from the plans and by disclaiming responsibility for those defects. In *Hibschman Pontiac, Inc. v. Batchelor* (1977), 266 Ind. 310, 316, 362 N.E.2d 845, 848, a majority of this Court found there was "cogent proof to establish malice, fraud, gross negligence and oppressive conduct" on the part of a car dealership whose employees failed to repair an automobile despite the purchaser's repeated requests. By contrast, in *Travelers Indem. Co. v. Armstrong* (1982), Ind., 442 N.E.2d 349, 364, a majority of this Court reversed an award of punitive damages in an insurance contract dispute because of insufficient evidence. Similarly, in *Lawyers Title Ins. Corp. v. Pokraka*, 595 N.E.2d 244, 250, this Court concluded that because the plaintiff "did not succeed in establishing the existence of an independent tort which would support the imposition of punitive damages," that portion of the judgment was reversed.

After further consideration of *Vernon Fire* and the results in subsequent cases, we conclude that the language in *Vernon Fire* was *dicta* when it suggested that punitive damages are available in contract actions even if the plaintiff does not also establish each element of a recognized tort for which Indiana law would permit the recovery of punitive damages. Moreover, such a notion rests on an unwise policy.

■ The reasons for this are several. First, we have stated that there is no right to punitive damages, which are in the nature of a criminal penalty. *Travelers*, 442 N.E.2d at 363. Punitive damages are "designed to punish the wrongdoer and to dissuade him and others from similar conduct in the future." *Orkin Exterminating Co., Inc. v. Traina* (1986), Ind., 486 N.E.2d 1019, 1021. Thus, such damages are not "compensatory" because plaintiff has already been awarded damages to compensate him for his loss. *Id.* at 1022. "The goal of punitive damages is to serve the public interest by deterring wrongful conduct in the future by the wrongdoer and others similarly situated." *Carroll v. Statesman Ins. Co.* (1986), Ind.App., 493 N.E.2d 1289, 1292, adopted by this Court at (1987), Ind., 509 N.E.2d 825. Once a plaintiff has been awarded compensatory damages, then he has been awarded all that he is entitled to receive as a matter of law. *Orkin*, 486 N.E.2d at 1022. "What if anything he may be given in addition is a windfall, and in making that decision all thoughts of benefitting the injured party should be laid aside and the sole issues are whether or not the Defendant's conduct was so obdurate that he should be punished for the benefit of the general public." *Id.*

A rule that requires establishment of an independent tort furthers the public interest in recognizing the existence of *bona fide* business disputes and separating them from breaches of contract achieved in a tortious manner. As we stated in *Travelers*, breaches of contract "will almost invariably be regarded by the complaining party as oppressive if not outright fraudulent." 442 N.E.2d at 363. "The public

1. The "clear and convincing" standard was not required prior to *Travelers Indem. Co. v. Arm-* *strong* (1982), Ind., 442 N.E.2d 349.

interest cannot be served by any policy that deters resort to the courts for the determination of bona fide business disputes," *Travelers,* 442 N.E.2d at 363, or prohibits one party to a contract from exercising his common law rights to breach a contract and pay a rightful amount of compensatory damages. Unlike torts, where the duty is owed to all and a broad measure of damages is available, contract obligations are owed only to the parties to the contract and damages are limited to those reasonably within the expectations of the parties when the contract is made. *Vernon Fire,* 264 Ind. at 607, 349 N.E.2d at 179, citing *Prosser, Law of Torts,* 613 (4th ed. 1971). Third, as the Court of Appeals noted in *Indiana & Michigan Elec. Co. v. Terre Haute Indus.* (1987), Ind.App., 507 N.E.2d 588, 617, "[i]t is not our prerogative to reopen the floodgates of punitive damages in contract cases, which were largely closed by the supreme court in *Vernon, Travelers,* and *Orkin,* and let all disputes and quarrels over broken contracts and disappointed business ventures become the subject of acrimonious litigation over punitive damages." Finally, as stated earlier, the *dicta* in *Vernon Fire* has never, in fact, been applied by this Court.

We note the Court of Appeals reached the opposite result in a case dealing with the same statute. *Joseph Schlitz Brewing Co. v. Central Beverage Co.,* 172 Ind.App. 81, 359 N.E.2d 566. In *Schlitz,* the brewer sought to have the distributor adopt certain internal controls which it had no legal right to do. The court noted that although the brewer's conduct did not fall within the well-defined parameters of any common law tort, the conduct was tortious in nature because its conduct was "an exhibition of bad faith toward the rights of its wholesalers." 172 Ind.App. at 103–4, 359 N.E.2d at 580. We do not find that *Schlitz* compels us to affirm the award of punitive damages here. Although it may have been correctly decided at the time, such is no longer the law.

We hold that in order to recover punitive damages in a lawsuit founded upon a breach of contract, the plaintiff must plead and prove the existence of an independent tort of the kind for which Indiana law recognizes that punitive damages may be awarded.

Having stated the proper legal standard for punitive damages in contract cases, we now address the parties' contentions as to whether the evidence presented in this case was sufficient. Best Beers claims the following evidence supports the imposition of punitive damages:

1) Miller employees made false statements (to their superiors) about Best Beers' sales efforts.

2) Miller employees made false statements (to their superiors) about the conduct of Best Beers' employees.

3) Miller made accusations in its termination letter which weren't supported by its own employees' reports.

4) Miller tolerated overage beer in the market after terminating Best Beers ostensibly because Best Beers had permitted overage beer to remain in the market.

5) A Miller employee said she would not rate Best Beers' performance as satisfactory no matter how well they did.

6) Miller solicited unfavorable comments about Best Beers in writing from selected retailers.

Best Beers does not seriously contend that there was sufficient evidence of an independent tort upon which punitive damages could have been awarded, but merely asserts that the above evidence is clear and convincing evidence of a "serious wrong tortious in nature." As discussed above, such evidence is insufficient to support an award of punitive damages in a breach of contract case. At best, such evidence establishes that Miller wrongfully terminated the contract, for which Best Beers was awarded compensatory damages. Under elementary contract principles, those compensatory damages fully compensate Best Beers to the extent allowed by law for all losses suffered by it as a result of the breach of contract. We discern nothing, based on the evidence presented at trial, compelling the conclusion that Best Beers is entitled to punitive damages.

### 4. *Admission of Crowley Letter*

Finally, Miller asserts that the Court of Appeals incorrectly concluded that admission of an irrelevant document was harmless error. Over Miller's objection, the trial court admitted into evidence another termination letter (the "Crowley letter") sent by Miller to another distributor two-an-one-half years before Best Beers was terminated. The Court of Appeals concluded that although the document was irrelevant, its admission was harmless error because it was cumulative of other evidence tending to show that Miller wrongfully terminated the contract. Miller claims it was prejudiced by the admission of the letter because that letter alone supported Best Beers' argument that Miller's conduct in Bloomington was part of a larger pattern of oppressive conduct toward its distributors.

■■■■ As the Court of Appeals correctly noted, the erroneous admission of evidence is not, per se, reversible error. *State v. Ingram* (1981), Ind., 427 N.E.2d 444, 447. We agree with the Court of Appeals that in the compensatory damage portion of this case, the Crowley letter was cumulative of the other evidence properly admitted on the issue of whether Miller wrongfully terminated the Agreement. Because there was ample evidence to support the award of compensatory damages and because we do not perceive that Miller's defense was unfairly prejudiced, its admission was harmless error.

### *Conclusion*

Accordingly, we grant transfer, vacate the opinion of the Court of Appeals, affirm the award of compensatory damages, and vacate the award of punitive damages.

SHEPARD, C.J., and DeBRULER, J., concur.

GIVAN, J., dissents, without opinion.

DICKSON, J., dissents, with separate opinion, in which GIVAN, J., concurs.

DICKSON, Justice, dissenting.

In *Vernon Fire & Casualty Ins. Co. v. Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173, this Court recognized two exceptions to the general rule that punitive damages are not recoverable in a contract action. The first arises when conduct of the breaching party not only constitutes breach of contract but also independently establishes the elements of a common law tort. *Id.* at 608, 349 N.E.2d at 180. The second occurs when the evidence reveals that a serious wrong, tortious in nature, has been committed, although the wrong "does not conveniently fit the confines of a pre-determined tort." *Id.*

Judicial response to the *Vernon* exceptions has been both positive and widespread. Not only have Indiana courts consistently endorsed the opinion,[1] but other jurisdictions have also cited *Vernon* while recognizing recovery of punitive damages within the context of a contractual relationship.[2]

1. *Lawyers Title Ins. Corp. v. Pokraka* (1992), Ind., 595 N.E.2d 244; *Bud Wolf Chevrolet, Inc. v. Robertson* (1988), Ind., 519 N.E.2d 135; *Art Hill Ford, Inc. v. Callender* (1981), Ind., 423 N.E.2d 601; *Travelers Indemn. Co. v. Armstrong* (1982), Ind., 442 N.E.2d 349; *Hibschman Pontiac, Inc. v. Batchelor* (1977), 266 Ind. 310, 362 N.E.2d 845; *Kruszewski v. Kwasneski* (1989), Ind.App., 539 N.E.2d 965; *World Productions, Inc. v. Capital Improvement Bd. of Managers of Marion County* (1987), Ind.App., 514 N.E.2d 634; *Bank of New York v. Bright* (1986), Ind.App., 494 N.E.2d 970; *Liberty Mut. Ins. Co. v. Parkinson* (1985), Ind.App., 487 N.E.2d 162; *Hall–Hottel Co. v. Oxford Square Coop.* (1983), Ind.App., 446 N.E.2d 25; *Campbell v. Railroadmen's Fed. Sav. and Loan Ass'n* (1982), Ind.App., 443 N.E.2d 81; *Shelby Fed. Sav. and Loan Ass'n v. Doss* (1982), Ind.App., 431 N.E.2d 493; *Southern*

*Sch. Bldgs. v. Loew Elec., Inc.* (1980), Ind.App., 407 N.E.2d 240; *Peterson v. Culver Educ. Found.* (1980), Ind.App., 402 N.E.2d 448; *Owen County Farm Bureau Coop. Ass'n v. Waeger* (1980), Ind. App., 398 N.E.2d 713; *First Fed. Sav. and Loan Ass'n v. Mudgett* (1979), Ind.App., 397 N.E.2d 1002; *United Farm Bureau Life Ins. v. Fultz* (1978), 176 Ind.App. 217, 375 N.E.2d 601; *State Farm Mut. Auto Ins. v. Shuman* (1977), 175 Ind.App. 186, 370 N.E.2d 941; *Prudential Ins. v. Executive Estates, Inc.* (1977), 174 Ind.App. 674, 369 N.E.2d 1117; *Jos. Schlitz Brewing v. Central Beverage* (1977), 172 Ind.App. 81, 359 N.E.2d 566; *Jones v. Abriani* (1976), 169 Ind.App. 556, 350 N.E.2d 635.

2. *McCullough v. Golden Rule Ins. Co.* (1990), Wyo., 789 P.2d 855; *Romero v. Mervyn's* (1989), 109 N.M. 249, 784 P.2d 992; *McCutchen v. Liberty Mut. Ins. Co.* (N.D.Ind.1988), 699 F.Supp. 701;

The majority opines that the second *Vernon* exception has never been applied by this Court, noting that in several cases where we have permitted punitive damages in a contract action, we have found evidence of an independent tort. *Bud Wolf Chevrolet, Inc. v. Robertson* (1988), Ind., 519 N.E.2d 135; *Art Hill Ford, Inc. v. Callender* (1981), Ind., 423 N.E.2d 601; *Hibschman Pontiac, Inc. v. Batchelor* (1977), 266 Ind. 310, 362 N.E.2d 845. Examination of these cases, however, reveals that in each, prior to finding that punitive damages were justified, we specifically made reference to fraud, malice, gross negligence, or oppression which "mingle" in the controversy—the language we emphasized in *Hibschman* when explaining the second *Vernon* exception. *Id.* at 314, 362 N.E.2d at 847. Additionally, while we did not specifically identify the second exception as the basis of our affirmance of punitive damages in these cases, neither did we expressly articulate the finding of an independent tort. These opinions do not express greater reliance upon the first rather than the second *Vernon* exception. I respectfully disagree with the majority's conclusion that the second exception has never been utilized by this Court.

Furthermore, the second *Vernon* exception has long been employed by the Court of Appeals to award punitive damages in the context of a contract breach. In *Liberty Mut. Ins. Co. v. Parkinson* (1985), Ind. App., 487 N.E.2d 162, punitive damages were upheld when an insurance company demonstrated bad faith in settling a claim under uninsured motorist coverage. Relying on the second exception, the court observed: "we have found no reason to adopt bad faith as an independent tort in this state and we see no need to adopt such an action now." *Id.* at 165. Similarly affirming punitive damages against an insurer in the absence of an independent tort, the court instructed that "a complaint which requests punitive damages in an action for breach of contract need not contain all of the elements which must be specifically alleged for actionable fraud." *State Farm Mut. Auto. Ins. Co. v. Shuman* (1977), 175 Ind.App. 186, 196, 370 N.E.2d 941, 950. Likewise, when punitive damages were awarded where the seller of a defective mobile home fraudulently refused to refund the buyer's deposit, punitive damages were justified even though "as is often the case, the findings do not specifically set out all five elements of the tort of fraud...." *Jones v. Abriani* (1976), 169 Ind.App. 556, 580, 350 N.E.2d 635, 650.

The Court of Appeals, in a case somewhat similar to that before us, determined that conduct by a brewing company, while failing to meet the common law elements of tort, nevertheless was sufficiently tort-like to sustain an award of punitive damages. *Jos. Schlitz Brewing Co. v. Central Beverage Co.* (1977), 172 Ind.App. 81, 359 N.E.2d 566. The brewer's breach of a distribution contract, allegedly precipitated by the distributor's refusal to adopt internal management controls required by the brewer, was found to be tortiously oppressive conduct. *Id.* at 103, 359 N.E.2d at 580. The court observed that punitive damages properly served the public interest inasmuch as the brewer's conduct contravened principles of free market economy which could ultimately manifest itself in higher prices for consumers. *Id.* at 104, 359 N.E.2d at 581.

This Court is unanimous in its recognition of the continued viability of the first *Vernon* exception based upon the establishment of an independent tort. Today, however, the majority abruptly seeks to modify *Vernon* and its progeny by relegating to *dicta* the exception permitting punitive damages where a contract breach attended by egregiously culpable conduct falls short of an independently actionable tort. However attractive it may be to limit an award of punitive damages to such bright-line situations, reprehensible behavior often defies strict tort categorization

Roberts v. Western–Southern Life Ins. Co. (N.D.Ill.1983), 568 F.Supp. 536; *Canada Dry Corp. v. Nehi Beverage Co.* (7th Cir.1983), 723 F.2d 512; *Central Armature Works, Inc. v. Amer-* ican Motorists Ins. Co. (D.D.C.1980), 520 F.Supp. 283; *General Motors v. Piskor* (1977), 281 Md. 627, 381 A.2d 16.

and should not go undeterred merely because it fails to completely conform to the precise contours of pre-existing tort classifications.

The majority speculates that recovery of punitive damages under the second *Vernon* exception would "reopen" the floodgates of punitive damages in contract cases. I disagree. The gates have already been open for the 17 years since *Vernon*, and neither catastrophe nor havoc has resulted. Twin restraints of case law and statutory enactment are clearly in place. Punitive damages are appropriate only upon clear and convincing evidence showing that the defendant "acted with malice, fraud, gross negligence or oppressiveness" and that such conduct "was not the result of a mistake of fact or law, honest error o[f] judgment, overzealousness, mere negligence, or human failing." *Bud Wolf*, 519 N.E.2d at 137. Moreover, Ind.Code § 34–4–34–2 likewise emphasizes that facts supporting punitive damages must be established by "clear and convincing evidence." It is not surprising that, notwithstanding *Vernon*, there has been no flood of punitive damages judgments in Indiana courts.

*Vernon's* flexible and responsive application of the law to category-resistant dimensions of human behavior represents an enlightened approach to the infinite variations that elude rigid doctrinal formulations. Experience has shown this approach to be wise, effective, balanced, and just. It should not now be discarded.

GIVAN, J., concurs.