**FIRST FEDERAL SAVINGS BANK OF INDIANA and Frank E. Pavlic, Appellants–Defendants,**

v.

**Frank GALVIN, Appellee–Plaintiff.**

No. 45A05–9206–CV–198.

Court of Appeals of Indiana, Fifth District.

July 12, 1993.

Transfer Denied Oct. 1, 1993.

R. Brian Woodward, Anderson, Tauber & Woodward, P.C., Merrillville, for appellants-defendants.

Robert E. Stochel, Hoffman & Stochel, Crown Point, for appellee-plaintiff.

BARTEAU, Judge.

Frank Galvin sued First Federal Savings Bank of Indiana to recover a commission First Federal had agreed to pay him for finding a buyer for a strip mall owned by First Federal. A jury awarded Galvin compensatory damages of $74,067 and punitive damages of $33,900. First Federal appeals, raising five issues which we consolidate as:

1. Whether the trial court erred in denying First Federal's motion for judgment on the evidence because the evidence showed that Galvin violated the Real Estate Licensing Act and thus was not entitled to a commission;

2. Whether the trial court erred in denying First Federal's motion for judgment on the evidence because the evidence showed that the parties did not have a written agreement to pay Galvin a commission;

3. Whether the trial court erred in allowing evidence of Galvin's termination from employment by First Federal to support an award of punitive damages because Galvin was an employee-at-will; and

4. Whether First Federal is entitled to a new trial because the trial court erroneously instructed the jury.

FACTS

Frank Pavlic, president of First Federal, and Galvin had been long-time friends when Pavlic agreed to pay a commission of seven percent (7%) to Galvin if Galvin found a purchaser for Sheffield Commons, a strip mall First Federal acquired through foreclosure. Galvin and Pavlic never signed a written commission agreement. Galvin eventually found a purchaser for Sheffield Commons, but First Federal would not pay him the seven percent (7%) commission. First Federal offered to pay Galvin a five percent (5%) commission which Galvin refused, insisting on the seven percent (7%) commission already agreed to by First Federal. Galvin is not a licensed real estate broker.

Pavlic approached Galvin about finding a buyer for Sheffield Commons in 1987. The initial asking price for the mall was $1,400,000, but this was reduced to $1,200,000 shortly after Galvin became involved. Also, First Federal was only interested in a cash deal. In April or May, 1988, Galvin became employed by First Federal as a mortgage loan originator. In connection with this, he was expected to wrap up his own outside business dealings within a few months. He was, however, expected to continue his efforts to find a buyer for Sheffield Commons. Greg Jordan, First Federal's general counsel, asked Galvin to give him a listing of all properties Galvin was attempting to sell for the bank and to tell him the agreed upon compensation.

Galvin sent Jordan a letter stating that Pavlic had agreed to pay him a seven percent (7%) commission for selling Sheffield Commons.

Around the same time Galvin became employed full-time by First Federal, he contacted Thomas Schmal, a representative of the eventual buyer of Sheffield Commons. Schmal presented an initial verbal offer to Galvin of $750,000 but the bank refused that offer. On July 12, 1988, First Federal, through its Senior Loan Committee, authorized Pavlic to accept any cash offer for Sheffield Commons in the amount of $800,-000 or more. Minutes from a July 19 meeting indicate that while it was initially approved to pay Galvin a seven percent (7%) finder's fee if Sheffield Commons was sold for $1,200,000, the finder's fee if the purchase price was less than $1,200,000 would be three and one-half percent (3½%). After further conversations with Galvin during the next few months, Schmal presented an offer dated September 6, 1988, to purchase Sheffield Commons for $850,000. This offer was accepted by First Federal and Schmal then began negotiating directly with Greg Jordan. Prior to this time, Schmal was dealing directly with Galvin, who was conveying information between Schmal and First Federal and generally facilitating the negotiating process.

Other facts will be provided as necessary.

## MOTION FOR JUDGMENT ON THE EVIDENCE

■ First Federal claims that the trial court erroneously denied its motion for judgment on the evidence at the close of Galvin's case and again at the close of the evidence. On appeal, we use the same standard of review as the trial court in determining the propriety of a judgment on the evidence. *Dahlin v. Amoco Oil Corp.* (1991), Ind.App., 567 N.E.2d 806, 810, *trans. denied.* When the trial court considers a motion for judgment on the evidence, it must view the evidence in a light most favorable to the non-moving party. Judgment may be entered only if there is no substantial evidence or reasonable infer-ence to be drawn therefrom to support an essential element of the claim. *Id.; Sipes v. Osmose Wood Preserving Co.* (1989), Ind., 546 N.E.2d 1223, 1224.

First Federal argues that the evidence does not support the verdict in favor of Galvin for two reasons: (1) The agreement to pay Galvin a commission is void because the evidence shows that he was not a licensed real estate broker; and (2) Galvin cannot recover a commission because the agreement was not in writing. We will address these two grounds separately.

### Real Estate Licensing Act

First Federal points to Indiana Code 25–34.1–3–2 in support of its claim that the agreement to pay Galvin a commission is void. That statute provides:

> no person shall, for consideration, sell, buy, trade, exchange, option, lease, rent, manage, list, or appraise real estate or negotiate or offer to perform any of those acts in Indiana or with respect to real estate situated in Indiana, without a license.

In addition, I.C. 25–34.1–6–2 states:

> (a) A person who performs the acts of a salesperson without a salesperson license [or] performs the acts of a broker without a broker license[,] ... commits a Class B infraction.... (b) In all actions for the collection of a fee or other compensation for performing acts regulated by this article, it must be alleged and proved that, at the time the cause of action arose, the party seeking relief was not in violation of this section.

Thus, under I.C. 25–34.1–6–2, in order to prevail on a claim for a commission, the plaintiff must prove that he or she was a licensed real estate salesperson or broker, if the plaintiff performed the acts of a salesperson or broker. "Broker" is defined as: "... a person who, for consideration, sells, buys, trades, exchanges, options, leases, rents, manages, lists, or appraises real estate or negotiates or offers to perform any of those acts." I.C. 25–34.1–1–2. "Salesperson" is similarly defined as: "... an individual, other than a broker, who, for consideration and in association with and

under the auspices of a broker, sells, buys, trades, exchanges, options, leases, rents, manages, or lists real estate or offers to perform any of those acts." *Id.* The activities prohibited by I.C. 25–34.1–3–2 without a license are the activities of a broker or salesperson as defined in I.C. 25–34.1–1–2.

■ A contract made in violation of a statute is void. *Hoffman v. Dunn* (1986), Ind.App., 496 N.E.2d 818. In *Hoffman,* a listing agreement, including an agreement to pay a commission, was not enforced by the court because one of the partners of the real estate company acting as a broker was not a licensed real estate broker. Because not all of the partners were licensed brokers, the contract to perform broker services for a commission violated the statute and the contract was void. It is clear that if Galvin's activities concerning the sale of Sheffield Commons included any of the acts described in I.C. 25–34.2–3–2 he is not entitled to recover a commission because he is not licensed.

■ To determine whether Galvin's activities fall within the statute, such that he acted as a real estate broker or salesperson, we begin by looking at the language of the statute. The activities one must be licensed to perform in order to receive a commission are: selling, buying, trading, exchanging, optioning, leasing, renting, managing, listing, or appraising real estate, or *negotiating any of those acts* or offering to perform any of those acts. I.C. 25–34.1–3–2; I.C. 25–34.1–1–2 (our emphasis). First Federal argues that Galvin's activities are covered by the statute because he participated in negotiating the sale of Sheffield Commons by finding the purchaser and bringing the parties to agreeable terms. Galvin claims that the statute does not apply to him because he merely acted as a "finder" by putting First Federal in contact with a purchaser, but remained uninvolved in the negotiations.

Whether a mere "finder" is subject to the licensing requirements of the present statute is a question of first impression in Indiana. A previous statute defining "real estate broker" was applied to finders in *Folsom v. Callen* (1956), 126 Ind.App. 201,

131 N.E.2d 328. The court concluded the plaintiff was a real estate broker and subject to licensing requirements where the plaintiff and his salesman "procured prospects, two of whom became ultimate purchasers; and that through the assistance of appellant and his salesman, the transaction was closed and the contract signed by [defendant] and the purchasers." 131 N.E.2d at 330. The court based its decision on the fact that the transaction, while primarily the sale of an ongoing business concern, also included the leasing of the real estate upon which the hotel building was located. Whether the plaintiff had done more than merely "find" the purchaser was not at issue because the language of the statute defining "real estate broker" included the phrase "procuring of prospects". *Id.* (quoting Burns Ann. St. 63–2422 (1951 Replacement)).

■ In determining whether Galvin, if he was a mere "finder," is subject to the current statute, we cannot ignore the fact that the legislature has amended the statute and in the process taken out the language "procuring of prospects." When construing a statute, we must ascertain and implement the legislature's intent by giving effect to the plain and ordinary meaning of the language used. *Wright v. Fowler* (1984), Ind.App., 459 N.E.2d 386. We presume that an amendment of a prior statute is intended to change the law unless it clearly appears the amendment was passed to clarify the legislature's original intent. *Id.* Another consideration in construing a statute is to give effect to the purpose of the statute. *State v. Adams* (1992), Ind.App., 583 N.E.2d 799, *trans. denied.* The purpose of the Real Estate Licensing Act is to protect citizens "from possible loss at the hands of incompetent or unscrupulous persons acting as brokers.... In order to effectuate the purpose of the Act it has been provided that only licensed persons may perform any acts as real estate brokers...." *Hoffman,* 496 N.E.2d at 822 (quoting *Schreibman v. L.I. Combs & Sons, Inc.* (7th Cir.1964), 337 F.2d 410, 412, *cert. denied* 380 U.S. 911, 85 S.Ct. 896, 13 L.Ed.2d 797 (1965)).

**[7]** Based upon the fact that the legislature has significantly changed the language of the statute to remove reference to "procuring purchasers" and based upon the purpose of the statute, we are convinced that the legislature did not intend to prohibit unlicensed persons from collecting a commission for performing the services of a finder. A person acting as a mere finder, without negotiating the transaction, is not performing any activities that require special knowledge or competence. A finder merely introduces an interested buyer to the owner of the property being sold. *Loyd v. Saffa* (1986), Okla.App., 719 P.2d 844, *overruled on other grounds Commodore Home Systems, Inc. v. Citicorp Acceptance Co.* (1989), Okl., 780 P.2d 674. We stress, however, that to avoid the licensing requirements, a person may do no more than act as a "finder." Once a person crosses the line and takes part in negotiating a transaction, the person is acting as a broker and must be licensed in order to receive a commission.

We find support for this interpretation of our statute in cases from other jurisdictions with similar statutes. For example, in *White v. Miriam Realty Co.* (1977), Mo. App., 547 S.W.2d 184, the Missouri Court of Appeals held that the Missouri Real Estate Licensing Act did not apply to one who did not represent either party to the real estate transaction but merely introduced the buyer to the seller who then negotiated their own contract. The Missouri statute [1] defining a broker who must be licensed used language similar to the Indiana statute: "sells or offers, [sic] for sale, buys or offers to buy, exchanges or offers to exchange the real estate of others; or who leases or offers to lease, rents or offers for rent the real estate of others; ...." In support of its decision, the Missouri court noted that

> even though the real estate licensing statutes are an exercise of the police power "to protect the public from the evils of fraud and incompetency," ... and "our courts have construed Chapter 339 very strictly, and have trenchantly

turned aside various attempts to avoid or erode the provisions of Section 339.150 and 339.160," ... this purpose is not violated if White is allowed to recover on this contract after dealing only with licensed or experienced persons, who were aware that he was not licensed. As the trial court noted, in such a situation "there is no danger of an unlicensed broker taking advantage of the public."

*Id.* at 187 (citations omitted); *see also Tyrone v. Kelley* (1973), 9 Cal.3d 1, 106 Cal. Rptr. 761, 507 P.2d 65 (unlicensed person may recover commission for merely finding a buyer, but if person participates in negotiating, commission cannot be recovered); *see generally* 24 A.L.R.3d 1160, 1172–74, for a collection of cases from jurisdictions which have addressed this issue.

We recognize that other jurisdictions have rejected the approach we take today. *See, e.g., Alford v. Raschiatore* (1949), 163 Pa.Super. 635, 63 A.2d 366; *Cardillo v. Canusa Extrusion Engineering, Inc.* (1985), 145 Mich.App. 361, 377 N.W.2d 412. However, we do not agree with the overly-broad construction of the term "negotiate" utilized by those courts to cover the situation where a person merely introduces the owner and buyer. We choose to leave it to the legislature to specifically make finders subject to the statute, as indeed it once did, if that is what the legislature desires.

■ The trial court did not err in denying First Federal's motion for judgment on the evidence. The evidence presented at trial is conflicting as to the extent of Galvin's involvement in the transaction. Therefore, the court could not say that as a matter of law, Galvin acted as a broker without a license. Rather, the question of whether Galvin crossed the line and participated in negotiations, and thus, acted as a broker, is a question of fact which must be left to the jury. Whether Galvin is required to have a real estate license to recover a commission depends on the jury's findings. However, the jury was not instructed on the applicable law because the

---

1. The Missouri legislature has since amended the statute defining "broker" to include one who procures purchasers. *King v. Clifton* (1983), Mo.App., 648 S.W.2d 193.

trial court apparently decided that the Real Estate Licensing Act was not applicable as a matter of law.[2] If, after being properly instructed, the jury finds that Galvin only introduced the parties and was not involved in negotiations, the Act is not applicable. If, however, the jury finds he did act as a broker by participating in negotiations, the Act is applicable. Because the applicability of that statute depends on a question of fact to be answered by the jury, First Federal is entitled to a new trial so that the jury may make that determination.

Apart from making a distinction between "brokers" and "finders" under the statute, Galvin takes the position that he is not subject to the Licensing Act even if the jury finds he acted as a broker because he falls within one of the statutory exceptions. Specifically, he points to I.C. 25–34.1–3–2(b)(9), which exempts from the licensing statute "acts performed by a regular, full-time, salaried employee of a person in relation to real estate owned or leased by that person unless the employee is licensed under this article, in which case the article does apply to him." Galvin argues that because he was employed by First Federal, he was not required to be licensed in order to recover a commission for finding a purchaser for Sheffield Commons. We do not agree that the employee exception applies to Galvin.

Galvin was not employed as a regular, full-time, salaried employee at the time Pavlic agreed to pay him a commission to find a purchaser for Sheffield Commons. Subsequently, Galvin was employed full-time by First Federal as a loan originator. The job description relates only to loan solicitations and related services. It does not mention finding purchasers for property owned by First Federal. For this full-time employment, Galvin was to be compensated on a commission basis according to the amount of loans he originated. The "Compensation Program" outlined in the "Loan Originator Agreement" does not mention compensation for activities related to finding purchasers for property owned by First Federal. The agreement does contain a provision allowing Galvin six months from the date of hire to dissolve his interests in outside business and allowing Galvin to spend the majority of his first two to three weeks closing his current deals in progress. Further, the parties specifically agreed that Galvin would continue to find a purchaser for Sheffield Commons *for the previously agreed upon commission,* and not as part of his new employment with First Federal. It is apparent that Galvin's efforts to find a purchaser for Sheffield Commons was outside the scope of his full-time employment with First Federal, namely, originating loans.

■ The statute provides that a regular, full-time, salaried employee of the owner of the property does not need to be licensed in order to perform certain acts for compensation. We conclude that the legislature intended to exempt the employee if the acts listed in the statute are being performed within the scope of the duties for which the employee is employed as a regular, full-time, salaried employee. For example, if a person is employed by the real estate owner as a regular, full-time, salaried employee, and if the person's duties as such an employee are to perform the acts listed in I.C. 25–34.1–3–2 with respect to property owned by the employer, then the person could be compensated, presumably through the regular salary as an employee, even though the person is not a licensed broker. On the other hand, if the employee undertakes to perform any of the acts listed in I.C. 25–34.1–3–2 for compensation and those activities are outside the scope of the regular employment, then the employee must be licensed.

**2.** The trial court refused to give First Federal's tendered instruction number 22, which addressed the licensing requirement and the employee exception. Galvin argues that First Federal has waived any error in the refusal of this instruction because First Federal had already tendered the maximum number of instructions allowed under T.R. 51 and the trial court did not give permission to tender more than the maximum ten (10) instructions. This argument has no merit. The trial court specifically stated in the record that the refusal of the instruction was not on the basis of T.R. 51 and the court did in fact allow both parties to tender more than ten (10) instructions.

This interpretation of our statute is consistent with the interpretation given to similar statutes in other jurisdictions. *See, e.g., Edmonds v. Fehler & Feinauer Construction Co.* (6th Cir.1958), 252 F.2d 639 (applying Kentucky law) (person entitled to statutory exemption when the acts for which a license is necessary were performed for the employer/owner in the employee's regular course of employment); *Palkoski v. Garcia* (1954), 32 N.J.Super. 343, 108 A.2d 271, *aff'd* 19 N.J. 175, 115 A.2d 539 (1955) ("[s]ince ... procurement of tenants was no part of regular employment nor incidental to it, the situation is the same in legal effect as if he were a complete stranger to the corporate owner"); *Brown v. Haverfield* (1976), 276 Or. 911, 557 P.2d 233 ("regular employee," as used in real estate licensing statute, means an employee (as distinct from an independent contractor) whose services for his employer are of a recurring nature which the employee is expected to perform from time to time *pursuant to his agreement*).

■ We conclude that because Galvin did not find a purchaser for Sheffield Commons pursuant to his regular employment by First Federal, he may not rely on that exception to the licensing requirements. Whether he is entitled to a commission even though he is not licensed will depend upon his level of involvement in the transaction as determined by the fact-finder.

### Written Agreement

First Federal next claims that its motion for judgment on the evidence should have been granted because the oral agreement to pay Galvin a commission is not enforceable. Indiana Code 32-2-2-1 provides:

No contract for the payment of any sum of money or thing of value, as and for a commission or reward for finding or procuring by one (1) person of a purchaser for the real estate of another, shall be valid unless the same shall be in writing, signed by the owner of such real estate or his legally appointed and duly qualified representative: Provided, That any general reference to such real estate sufficient to identify the same shall be

deemed to be a sufficient description thereof.

The only writings in the record that concern the payment of a commission to Galvin are the letter sent by Galvin to Jordan, First Federal's counsel, at the time Galvin was employed by First Federal as loan originator, and two minute entries by the First Federal Senior Loan Committee. There is no writing signed by First Federal agreeing to pay a commission to Galvin. This, however, does not prevent us from concluding that the agreement to pay Galvin a commission is enforceable, if the jury finds that Galvin's involvement in the transaction was as a finder.

■ The purpose of I.C. 32-2-2-1 is to prevent disputes over the terms of a commission contract for finding a purchaser for real estate. *Gerardot v. Emenhiser* (1977), 173 Ind.App. 353, 363 N.E.2d 1072. The statute is to protect *owners* against fraud; it is not to be used by owners to perpetrate a fraud on the one seeking a commission. *Brown v. Poulos* (1980), Ind. App., 411 N.E.2d 712. In furtherance of these policies, performance by the finder or broker may take the agreement out of the provisions of I.C. 32-2-2-1. *Voelkel v. Berry* (1966), 139 Ind.App. 267, 218 N.E.2d 924; *contra Gerardot*, 363 N.E.2d at 1077 (the court incorrectly cites *Voelkel* for the proposition that there can be no recovery on a theory of partial performance when no written contract exists between broker and seller).

■ Here, we have written evidence of an agreement by First Federal to pay a commission to Galvin for finding a purchaser for Sheffield Commons and Galvin has performed his part of the bargain. Thus, we conclude the agreement may be enforced. Galvin sent a letter to First Federal stating that Pavlic had agreed to pay him a seven percent (7%) commission for finding a buyer for Sheffield Commons. First Federal never contradicted this representation by Galvin, and in fact, the minutes of the Senior Loan Committee support this representation of the agreement. Minutes from a July 19, 1988 meeting state: "It was originally approved to pay Frank

Galvin a finder's fee of 7% should Sheffield Commons be sold for $1,200,000. After a brief discussion, it was agreed that a finder's fee of 3½% will be paid ... should Sheffield Commons sell for less than $1,200,000, providing the Bank nets $800,000." Later at a January 4, 1989 meeting, the Loan Committee agreed to pay a commission of 5% on the $850,000 purchase price.

The crux of the present disagreement is whether the original agreement to pay seven percent (7%) was contingent on the purchase price being $1,200,000. Galvin says it was not and First Federal says it was. The evidence in the record is conflicting, but that conflict is best left to the factfinder to resolve in this case. We hold under the facts of this case, where First Federal clearly agreed to pay Galvin a commission and Galvin performed his part of the bargain, I.C. 32–2–2–1 does not operate to prevent enforcement of the agreement against First Federal. Thus, the trial court properly denied First Federal's motion for judgment on the evidence. Upon retrial, the jury may well find that the seven percent (7%) commission was contingent upon a selling price of $1,200,000, and that Galvin is not entitled to a commission. However, as a matter of law, I.C. 32–2–2–1 does not preclude enforcement assuming the evidence presented at the first trial is again presented upon retrial.

## PUNITIVE DAMAGES

 First Federal next argues that the trial court erroneously allowed evidence of Galvin's full-time employment termination by First Federal to be used to support a punitive damages award. During the pendency of this case on appeal, our Supreme Court addressed the issue of punitive damages in a breach of contract case. The rule is that punitive damages are not allowed in a breach of contract action and no exceptions to this rule exist. *Miller Brewing Co. v. Best Beers of Bloomington, Inc.* (1993), Ind., 608 N.E.2d 975. "In order to recover punitive damages in a lawsuit founded upon a breach of contract, the plaintiff must plead and prove the existence of an independent tort of the

kind for which Indiana law recognizes that punitive damages may be awarded." *Id.* at 984. The punitive damages are awarded for the tort, not the breach of contract. *Id.* at 981. It is not sufficient to allege and prove "tort-like" conduct of the breaching party.

As we noted above, the supreme court clarified the standard for punitive damages in a breach of contract action after this case was pending on appeal. Thus, upon retrial of this cause, Galvin will have the opportunity to submit evidence in an attempt to prove that First Federal's conduct in breaching the contract amounted to an independent tort for which punitive damages may be awarded.

## ERRONEOUS INSTRUCTIONS

First Federal argues that it is entitled to a new trial because the trial court gave the jury several erroneous and conflicting instructions. We need not discuss the jury instructions in light of the fact that we are reversing the judgment and in doing so have provided the trial court with the proper law to be applied upon retrial.

## CONCLUSION

The trial court erroneously made the determination that the Real Estate Licensing Act was inapplicable. It is for the jury, after proper instruction on the law, to determine whether Galvin was a mere finder or performed the services of a broker. Further, in the event the jury finds that Galvin did not act as a broker, enforcement of the agreement to pay a commission is not precluded by the Statute of Frauds under the facts of this case. Whether punitive damages are available will depend upon whether Galvin presents evidence of the breaching conduct that amounts to an independent tort for which punitive damages may be awarded. The judgment against First Federal is reversed and this cause is remanded for a new trial.

RUCKER and HOFFMAN, JJ., concur.