**INDIANA MICHIGAN POWER COMPANY, Appellant/Cross–Appellee–Defendant,**

v.

**Raymond RUNGE and Tina Runge, Appellees/Cross–Appellants–Plaintiffs.**

No. 50A05–9811–CV–529.

Court of Appeals of Indiana.

Oct. 6, 1999.

Rehearing Denied Nov. 23, 1999.

Carmen M. Piasecki, Nickle & Piasecki, South Bend, Indiana, Tom Watson, Curtis Renner, Watson & Renner, Washington, D.C., Attorneys for Appellant/Cross–Appellee.

Robert J. Palmer, Christopher R. Putt, May, Oberfell & Lorber, South Bend, Indiana, Attorneys for Appellees/Cross–Appellants.

## OPINION

BROOK, Judge

### Case Summary

Appellant-defendant/cross-appellee Indiana Michigan Power Company ("IMPC"

or "appellant") files this interlocutory appeal to contest the trial court's jurisdiction over this case; the trial court's rulings on the admissibility of certain evidence; and the following trial court rulings on IMPC's motion for summary judgment: (1) denial of summary judgment on the claim of appellees-plaintiffs/cross-appellants Raymond Runge and Tina Runge ("Raymond" and "Tina," collectively referred to as "the Runges" or "appellees") that IMPC negligently designed, constructed, maintained, and operated its high-voltage electric power transmission line ("the line" or "the power line") that crosses their property and is the focus of the instant dispute; (2) denial of summary judgment on the Runges' claim that electric and magnetic fields (collectively referred to as "EMF") from the line constituted a trespass on their property; (3) denial of summary judgment on the Runges' claim that EMF from the line constituted a nuisance on their property; (4) denial of summary judgment on the Runges' claim that IMPC failed to warn them about possible harmful effects caused by EMF; (5) denial of summary judgment on the Runges' claim that IMPC breached an assumed duty to provide them with information about EMF; and (6) denial of summary judgment on the Runges' claim for punitive damages.

On cross-appeal, the Runges challenge the trial court's rulings on the admissibility of certain evidence and its grant of IMPC's motion for summary judgment on the issue of whether its alleged negligence caused them to suffer "adverse health effects."

We affirm in part and reverse in part and remand for further proceedings.

### Issues

IMPC raises nine issues for review, which we reorder and restate as follows:

(1) whether the trial court or the Indiana Utility Regulatory Commission ("the IURC") has jurisdiction over the Runges' claims;

(2) whether the trial court erred in denying IMPC's motion for summary judgment on the Runges' claim for punitive damages;

(3) whether the trial court erred in denying IMPC's motion for summary judgment on the Runges' trespass claim;

(4) whether the trial court erred in denying IMPC's motion for summary judgment on the Runges' nuisance claim;

(5) whether the trial court erred in denying IMPC's motion for summary judgment on the Runges' claim that IMPC failed to warn them about possible adverse health effects caused by exposure to EMF;

(6) whether the trial court erred in denying IMPC's motion for summary judgment on the Runges' claim of breach of an assumed duty;

(7) whether the trial court erred in denying IMPC's motion for summary judgment on the Runges' claim of negligent design, construction, maintenance, and operation of the line;

(8) whether the trial court erred in admitting certain evidence designated by the Runges in opposition to IMPC's motion for summary judgment; and

(9) whether the trial court erred in denying IMPC's motion to exclude the testimony of the Runges' expert scientific witnesses.

The Runges raise three issues on cross-appeal, which we reorder and restate as follows:

(10) whether the trial court erred in granting IMPC's motion for summary judgment on the Runges' claim that IMPC's negligence proximately caused adverse health effects;

(11) whether the trial court erred in denying the Runges' motion to strike the affidavit of Dennis J. Dillman

("Dillman") concerning the scope of IMPC's two easements on the Runges' property; and

(12) whether the trial court erred in granting IMPC's motion to strike certain portions of Tina's deposition.

## Facts and Procedural History

The facts relevant to our review indicate that on March 31, 1969, the former owners of the Runges' Elkhart County property in Middlebury, Indiana, conveyed to IMPC a "permanent right of way and easement for one electric power line" and the right to

locate, construct, reconstruct, erect, operate, use, repair, maintain, renew, remove, inspect, patrol, at any and all times, poles, towers or supported structures, conductors and all necessary or useful facilities and equipment with respect to such line for transmitting electric or other energy, including cross-arms, wires, cables, guys, anchors, counter-poises, grounding system, and all other appurtenant equipment and fixtures ... in, on, along, over, through and across [the "Premises"] .....

Together with the right to [IMPC] to ... remove from the Premises ... any trees, overhanging branches, vegetation, obstacles or obstructions which may endanger the safety or interfere with the installation, use, or enjoyment of all or any of [IMPC's] Facilities; to add to the number of and relocate at any time or times all of [IMPC's] Facilities; and of ingress and egress to, over and from the Premises and any adjoining lands of Grantor at any and all times for the purposes of exercising and enjoying any and all the rights hereby vested in [IMPC].[1]

On April 3, 1969, IMPC purchased a second easement with an area of approximately one-half acre that is located entirely within the first easement.[2] Both ease-

ment deeds contain a provision that states, "Grantor shall have the right to cultivate or otherwise use the Premises in any way not inconsistent with the easement hereby granted, but no building, structure or obstruction shall be placed by the Grantor under or within 85 feet (measured horizontally) of the centerline of the electric power line." The 345-kilovolt line was constructed in 1971, has been in operation since 1973, and is suspended above the backyard of the property. On March 21, 1989, Betty M. Nemeth deeded the property to the Runges "[s]ubject to any and all easements, current taxes, assessments, restrictions and rights of way of record."

The Runges and their two children moved into their house located on the property on March 30, 1989. In mid-April, while digging posts in the backyard, Raymond felt a sensation like "sharp grass" poking his ankles and developed a headache approximately two hours later. In late June 1989, the Runges and their friends and relatives experienced shocks while on the property. Soon thereafter, Raymond contacted IMPC about the shocking sensations, and IMPC employee William Pokorny ("Pokorny") visited the Runges in early July 1989 to measure the electrical and magnetic fields in the backyard. According to the Runges, Pokorny promised to "pass along any information, pro or con, that came across his desk regarding the effects of" EMF.

Pokorny then contacted Ali Nourai ("Nourai") at American Electric Power about calculating EMF levels on the Runges' property, but never shared the results of Nourai's calculations with the Runges. On August 9, 1989, Pokorny again visited the Runges with IMPC employee Richard Fohrer. Pokorny confirmed that the Runges' garage encroached on the centerline right-of-way as provided in Easement 200A, but the Runges refused to sign a

---

1. This easement is described in the record as "Easement 200."

2. This easement is described in the record as "Easement 200A."

consent-to-encroachment form that would have released IMPC from all liability.

On December 16, 1989, Tina used a home pregnancy test to confirm that she had become pregnant, but she suffered a miscarriage shortly thereafter. The Runges then sought opinions from various scientific experts regarding the possible health risks of living on their property, in addition to having EMF measurements taken of their yard and house by Environmental Management and Field Testing of Evanston, Illinois. The reliability of the testimony of the Runges' expert scientific witnesses is vigorously disputed by the parties and will be examined in greater detail below. The Runges eventually moved out of their house and filed suit against several parties, including Ameritrust National Bank ("Ameritrust"), the mortgage holder on their property, alleging that Ameritrust had failed to inform them about the "existence and extent of" IMPC's easements. Ameritrust released the Runges from their mortgage, and the Runges eventually sold the house at auction but retained ownership of the property.

The Runges initially filed suit against IMPC on May 24, 1990, and filed their first amended complaint on March 22, 1991. The amended complaint contained the following eight counts: (1) a strict product-liability claim premised on the alleged "defective condition" of the "unreasonably dangerous" electricity distributed by IMPC;[3] (2) a negligence claim alleging that IMPC's failure "to exercise reasonable care in the design, installation, construction, placement and maintenance" of the line proximately caused the Runges to suffer "physical and mental harm, pain and suffering, medical expenses, the loss of enjoyment of life and other damages"; (3) IMPC's failure to warn the Runges of the "concealed danger in the transmission lines"; (4) nuisance resulting from IMPC's failure to prevent EMF from "emanating

outside the designated areas of their alleged easement so as to not cause harm to the plaintiffs or their property"; (5) trespass of the "unreasonably high and dangerous levels" of EMF onto the Runges' property; (6) IMPC's breach of an assumed duty to provide the Runges "with any and all information available or known" to IMPC regarding EMF; (7) IMPC's taking of the Runges' property without just compensation as a result of its easements and the effects of EMF;[4] and (8) a request for punitive damages arising from IMPC's alleged "willful and wanton misconduct, gross negligence, and reckless indifference to the consequences of its actions." IMPC filed its answer and affirmative defenses to the Runges' first amended complaint on August 26, 1991.

On August 1, 1997, IMPC filed a motion for summary judgment and a motion to exclude expert testimony; the relevant arguments advanced in these motions will be explored in greater detail below. The Runges filed their responses to IMPC's motions on September 2, 1997. On September 8, 1997, IMPC filed a motion to strike certain evidentiary designations made by the Runges pursuant to Ind. Trial Rule 56(C) and filed replies in support of its previous motions. On September 10, 1997, the Runges filed a motion to strike Dillman's affidavit, to which IMPC filed an opposing memorandum on September 18, 1997; in his affidavit, Dillman opined that the Runges "took [their] property subject to all easements, which would include Easement 200 and 200A." The Runges filed a response to IMPC's motion to strike on September 18, 1997, and IMPC filed a reply to the Runges' response on October 14, 1997. The trial court heard argument on IMPC's motion to exclude and motion for summary judgment on September 10 and 11, 1997, and heard argument on the parties' motions to strike on October 28, 1997. On March 20, 1998, the

---

**3.** The trial court granted IMPC's motion to strike this claim on October 31, 1991.

**4.** The trial court granted IMPC's motion to dismiss this claim on October 31, 1991.

trial court entered findings and orders on all three motions.

The trial court granted IMPC's motion to strike certain T.R. 56(C) designations in part with respect to portions of Tina's deposition, but denied its motion in all other regards. The trial court denied IMPC's motion for summary judgment in part and granted it in part as outlined above and denied IMPC's motion to exclude the Runges' expert scientific testimony. Finally, the trial court denied the Runges' motion to strike Dillman's affidavit. IMPC now appeals from several of the trial court's rulings, and the Runges raise several issues on cross-appeal.

## Discussion and Decision

### I. Jurisdiction

IMPC argues that "[t]he touchstone of each of the Runges' claims is that the levels of EMF from the line on their property are too high," and that this issue "goes to the heart of the safety and reasonableness of the provision of electric service in Indiana, and therefore should be decided by the [IURC], the sole authority designated by the General Assembly to oversee and regulate utility operations." If the IURC determines pursuant to IND. CODE § 8–1–8.1–2 that rules are necessary "to protect the public health from electric and magnetic fields," IND.CODE § 8–1–8.1–3 states that it shall "establish requirements that reasonably protect the public health" from EMF. While IMPC admits that the IURC is powerless to award monetary damages, it invokes the doctrine of primary jurisdiction to assert that a trial court may assume jurisdiction of the Runges' claims, should any survive the IURC's determination whether there are unsafe EMF levels on the Runge property.

■ The Runges respond that their claims fall within the trial court's subject-matter jurisdiction, and we agree. In *Austin Lakes Joint Venture v. Avon Utili-*

ties, Inc., 648 N.E.2d 641 (Ind.1995), our supreme court drew a fine distinction between the doctrines of "exhaustion of remedies" and "primary jurisdiction" in the context of determining a trial court's ability to settle a dispute that is ostensibly within the purview of the administrative process. The supreme court noted that "[e]ven when neither statute nor agency rule specifically mandates exhaustion as a prerequisite to judicial review, the general rule is that a party is not entitled to judicial relief for an alleged or threatened injury until the prescribed administrative remedy has been exhausted."[5] *Id.* at 644.

"The doctrine of primary jurisdiction is an invention of the United States Supreme Court to deal with the problem that arises when the courts and an agency *both* have claims to jurisdiction of an issue in a case that has come before a court." *Id.* at 645 (emphasis supplied). Our supreme court viewed primary jurisdiction as an essentially "prudential" doctrine, while considering exhaustion of remedies to be "jurisdictional" in nature because a court would be powerless to decide a case in which the parties had not "exhausted the appeal process within the agency." *Id.* at 645. The supreme court then set out the following guidelines for cases in which a party "alleg[es] that the issues presented are within the jurisdiction of regulatory or administrative agencies to resolve":

> First, in order to determine whether a case is properly before the trial court, the court should examine each issue presented by the case. If at least one of the issues involved in the case is within the jurisdiction of the trial court, the entire case falls within its jurisdiction, even if one or more of the issues are clearly matters for exclusive administrative or regulatory agency determination. Where at least one of the issues or claims is a matter for judicial determination or resolution, the court is not ousted

---

5. We note that the IURC is exempted from the application of the Administrative Adjudication Act. *See* IND.CODE § 4–21.5–2–4; *North-*

*ern Indiana Public Service Co. v. Dozier*, 674 N.E.2d 977, 982, n. 2 (Ind.Ct.App.1996).

of subject matter jurisdiction by the presence in the case of one or more issues which arguably are within the jurisdiction of an administrative or regulatory agency [footnote omitted] . . . .

Once a trial court has determined that it has subject matter jurisdiction, it must review the issues in the case claimed to be matters within the purview of an administrative or regulatory agency to determine whether the *doctrine of primary jurisdiction* should be invoked, *i.e.*, whether the court, while retaining jurisdiction over the case, should refer an issue or some subset of issues in the case to the expert agency for its opinion or final decision . . . .

*Id.* at 646 (emphasis in original).

The supreme court then presented "three different fact patterns that can arise in these types of claims":

1. Certainly a trial court must invoke the doctrine of primary jurisdiction where one (but less than all) of the issues in the case requires exhaustion of remedies before judicial review can occur . . . . Those issues must be referred to the agency for determination.

2. When no issue of exhaustion of remedies or other clear requirement of referral of the issue in question to an agency is presented, the court must next decide whether the opposite fact pattern is present, *i.e.*, whether the administrative or regulatory agency truly has any jurisdiction over an issue at all. In such situations, of course, the doctrine of primary jurisdiction cannot be invoked because there is nothing to refer to the administrative or regulatory agency because there is nothing that the agency has the legal authority to decide . . . .

3. The third fact pattern arises where an issue in the case is one that can be decided by either the trial court or by the administrative or regulatory agency. In such cases, the decision whether to invoke the doctrine of primary jurisdiction is within the discretion of the trial court. The questions to ask in deciding whether to invoke the doctrine include (i) what sort of facts will arise and whether the kind of factfinding involved will be within the special competence and expertise of an administrative body, [footnote omitted] and (ii) to what degree uniformity in the regulatory scheme is desirable and to what degree a court decision might affect the uniformity of a regulatory scheme [footnote omitted].

*Id.* at 647 (emphasis in original). As did the supreme court in *Austin Lakes*, we conclude that the Runges' claims fall within the second category listed above. IMPC fails to cite, nor can we discover, any apposite rules that the IURC has promulgated regarding EMF levels and the public health that would assist in the determination of the instant dispute.

IMPC relies on our supreme court's decision in *Town Bd. of Orland v. Greenfield Mills, Inc.*, 663 N.E.2d 523 (Ind.1996), where the plaintiffs' complaint was dismissed with prejudice because of their failure to exhaust available administrative remedies; however, the Runges correctly point out that the plaintiffs in that case sought to enjoin the construction of a sewage treatment facility. In the instant case, the Runges seek monetary compensation for past injuries caused by IMPC's alleged failure to act with reasonable care under the circumstances. IMPC raises the specter of "a patchwork of potentially contradictory decisions" if "juries are allowed to substitute their judgments about EMF for that of the IURC," but fails to demonstrate that the IURC possesses unique or superior expertise regarding the issues raised by the Runges' claims, or even that the IURC is statutorily empowered to adjudicate them. *See Northern Indiana Public Service Co. v. Dozier*, 674 N.E.2d 977, 983–984 (Ind.Ct.App.1996) ("The IURC derives its power solely from the legislature and has no power to act unless such power is conferred by statute.").

■ Although we have determined that our analysis of the Runges' claims does not fall under the rubric of exhaustion of remedies, we observe that the "exhaustion rule assumes that an available statutory remedy exists at the time the challenged judicial relief is sought." *MHC Surgical Center Associates, Inc. v. State Office of Medicaid Policy and Planning,* 699 N.E.2d 306, 308 (Ind.Ct.App.1998). We also note that "a party is excepted from the exhaustion requirement when the remedy is inadequate or would be futile, or when some equitable consideration precludes application of the rule." *Smith v. State Lottery Com'n of Ind.,* 701 N.E.2d 926, 931 (Ind.Ct.App.1998). "To prevail upon a claim of futility, 'one must show that the administrative agency was powerless to effect a remedy or that it would have been impossible or fruitless and of no value under the circumstances.'" *Id.* (quoting *Indiana State Building and Construction Trades Council v. Warsaw Community School Corp.,* 493 N.E.2d 800, 806 (Ind.Ct.App.1986)). "Furthermore, the requirement of exhaustion of administrative remedies 'will be relaxed where there is grave doubt as to the availability of the administrative remedy.'" *Smith,* 701 N.E.2d at 931 (quoting *Indiana High Sch. Athletic Ass'n v. Raike,* 164 Ind.App. 169, 195, 329 N.E.2d 66, 82 (1975)). As discussed above, IMPC has failed to demonstrate that the Runges are challenging any of the IURC's regulations or that the IURC could provide the proper relief for the monetary damages sought.

In summary, we conclude that the trial court has subject-matter jurisdiction over all the Runges' claims, and that the doctrine of primary jurisdiction does not apply because the IURC has no legal authority to decide any of the issues in the instant case.

### Standard of Review for Denial of Summary Judgment Motion

■ IMPC argues that the trial court erred in denying its motion for summary judgment on the Runges' claims for puni-tive damages, trespass, nuisance, failure to warn, breach of an assumed duty, and negligence. A trial court's ruling on a motion for summary judgment comes before this Court "clothed with a presumption of validity." *Harvest Life Ins. Co. v. Getche,* 701 N.E.2d 871, 874 (Ind.Ct.App. 1998), *trans. denied* (1999). When reviewing the denial of a summary judgment motion, this Court applies the same standard as the trial court. *Tippecanoe Valley School Corp. v. Landis,* 698 N.E.2d 1218, 1220 (Ind.Ct.App.1998), *trans. denied* (1999). "We resolve any doubt as to any fact, or inference to be drawn therefrom, in favor of the non-moving party." *Id.* "Summary judgment should be granted only when the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.;* T.R. 56(C).

■ "When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense which bars the plaintiff's claim." *Carroll by Carroll v. Jagoe Homes, Inc.,* 677 N.E.2d 612, 615 (Ind.Ct.App.1997), *trans. denied.* Only after the party seeking summary judgment demonstrates the absence of any genuine issue of fact as to a determinative issue is the non-moving party compelled to come forward with contrary evidence. *Jarboe v. Landmark Community Newspapers of Indiana, Inc.,* 644 N.E.2d 118, 123 (Ind.1994). It is for this reason that we must review the propriety of the trial court's rulings on IMPC's summary judgment motion before we may consider the admissibility of the evidence that the Runges designated in opposition to IMPC's motion. We must determine on appeal whether there is a genuine issue of material fact and whether the trial court correctly applied the law, and we will reverse the trial court if we determine that it misapplied the law. *Landis,* 698 N.E.2d at

1220. As the party appealing the denial of its motion for summary judgment, IMPC bears the burden of persuading this Court that the trial court's ruling was improper. *Id.* "We will affirm the denial of summary judgment if it is sustainable on any legal theory or basis found in the evidentiary matter designated to the trial court." *GEICO Ins. Co. v. Rowell,* 705 N.E.2d 476, 480 (Ind.Ct.App.1999).

## II. Punitive Damages

IMPC argues that the trial court erred in denying its motion for summary judgment on the issue of punitive damages because its "operation of the power line on valid easements in accordance with applicable standards and the law" does not constitute conduct that merits the imposition of punitive damages. Our supreme court has stated that "there is no right to punitive damages, which are in the nature of a criminal penalty." *Miller Brewing Co. v. Best·Beers of Bloomington, Inc.,* 608 N.E.2d 975, 983 (Ind.1993). Punitive damages serve the public interest by deterring future wrongful conduct by the tortfeasor and others similarly situated, *id.,* and "may be awarded only if there is clear and convincing evidence that the defendant 'acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.' " *USA Life One Ins. Co. of Indiana v. Nuckolls,* 682 N.E.2d 534, 541 (Ind.1997) (quoting *Erie Ins. Co. v. Hickman,* 622 N.E.2d 515, 520 (Ind.1993)). This Court has previously held that "[t]he question of punitive damages is ultimately a question of fact for the jury to decide." *Whitten v. Kentucky Fried Chicken,* 570 N.E.2d 1353, 1358 (Ind. Ct.App.1991), *trans. denied* (1992); *see also Ackles v. Hartford Underwriters Ins. Corp.,* 699 N.E.2d 740, 742 (Ind.Ct.App. 1998), *trans. denied* (1999) ("Summary judgment must be denied if the resolution hinges upon state of mind, credibility of the witnesses, or the weight of the testimony."). Therefore, we conclude that the

trial court did not err in denying IMPC's motion for summary judgment on the issue of punitive damages.

## III. Trespass

A plaintiff in a trespass action must prove that he was in possession of the land and that "the defendant entered the land without right." *Lever Bros. Co. v. Langdoc,* 655 N.E.2d 577, 581–582 (Ind.Ct. App.1995); *Sigsbee v. Swathwood,* 419 N.E.2d 789, 799 (Ind.Ct.App.1981). "If the plaintiff proves both elements he is entitled to nominal damages without proof of injury." *Sigsbee,* 419 N.E.2d at 799. We are also mindful of the traditional rule that an action for trespass to real estate "cannot be maintained for an invasion of a right of way or easement." *State ex rel. Green v. Gibson Circuit Court,* 246 Ind. 446, 449, 206 N.E.2d 135, 137 (1965). "This rule is based upon the principle that trespass actions are possessory actions and that the right interfered with is the plaintiff's right to the exclusive possession of a chattel or land." *Id.*

IMPC argues that because the Runges have failed to establish either of the necessary elements of trespass, summary judgment must be granted in its favor. Under Indiana's summary judgment standard, however, merely asserting that the plaintiff has failed to produce evidence on each element of a claim is insufficient to entitle the defendant to the judgment sought. *See Jarboe,* 644 N.E.2d at 122 (promissory estoppel). Moreover, IMPC has failed to establish the absence of a genuine issue of material fact regarding whether IMPC committed a trespass "by allowing EMF to go beyond the limits of its easement on to the Runges' property"; whether IMPC exceeded the scope of its easement by allowing allegedly excessive EMF to be emitted from the power line; and whether the Runges sustained damages as the result of the alleged tres-

pass.[6]

Because both the legal and the scientific communities are currently divided over the precise nature of EMF and its ability to create a trespass, we may not decide this question as a matter of law and must affirm the trial court's determination that summary judgment is an inappropriate method for disposing of the Runges' trespass claim. *See Getche,* 701 N.E.2d at 874 ("Where material facts conflict, or undisputed facts lead to conflicting material inferences, summary judgment is inappropriate.... This is true even if the court believes the non-moving party will not succeed at trial.... Summary judgment should not be used as an abbreviated trial[.]"[7]).

### *IV. Nuisance*

IND.CODE § 34–19–1–1 reads in relevant part, "Whatever is: (1) injurious to health; (2) indecent; (3) offensive to the senses; or (4) an obstruction to the free use of property; so as essentially to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action."[8] According to IND.CODE § 34–19–1–2, any person whose "(1) property is injuriously affected; or (2) personal enjoyment is lessened[ ] by the nuisance" may bring an action to "abate or enjoin" it.[9]

IMPC asserts that because the Runges admitted for the purposes of their suit against Ameritrust that the utility easements cover their entire property, they should essentially be estopped from claiming that EMF created a nuisance beyond the easements. Additionally, IMPC cites *Howard v. Robinette,* 122 Ind.App. 66, 99 N.E.2d 110 (1951), *trans. denied* (1952) for

the proposition that "there is no cause of action for nuisance against a public utility properly operating under legislative authority."

■ Regardless of the binding effect of the Runges' admissions regarding the geographic scope of the utility easements, a closer reading of *Howard* reveals the following dispositive language:

The courts of this state have clearly established the rule that where a municipality or public utility company operates a utility under legislative authority, and within the right thus given, and reasonably within the exercise thereof, and where the legislature contemplates the doing of the act which causes the injury, and when the municipality uses due care and caution regarding the rights of the neighboring owners, any inconvenience or incidental damage which may arise *in the absence of any negligence* from the reasonable use of said property will be regarded as within the rule of *damnum absque injuria.*[10]

*Id.,* 122 Ind.App. at 72, 99 N.E.2d at 112 (initial emphasis supplied). As the Runges correctly observe, the questions of whether IMPC exercised due care and whether the EMF exceeded the scope of the easement are genuine issues of material fact that must preclude a grant of summary judgment on their nuisance claim. *See also Gray v. Westinghouse Elec. Corp.,* 624 N.E.2d 49, 54 (Ind.Ct.App.1993), *trans. denied* (1994) (alleged PCB contamination; "actual physical damage to person or property need not be alleged" in nuisance claim; "Generally, when determining what constitutes a nuisance, the question is

---

**6.** The genuine issues of material fact enumerated above were raised by the Runges in response to IMPC's motion for summary judgment pursuant to T.R. 56(C).

**7.** Omitted citations will hereinafter be indicated by "[.]" for purposes of legibility.

**8.** Formerly IND.CODE § 34–1–52–1; paragraph format altered from original.

**9.** Formerly IND CODE § 34–1–52–2; paragraph format altered from original.

**10.** *"Damnum absque injuria"* may be defined as follows: "Loss, hurt, or harm without injury in the legal sense; that is, without such breach of duty as is redressible by a legal action. A loss or injury which does not give rise to an action for damages against the person causing it." BLACK'S LAW DICTIONARY 393 (6th ed.1990).

whether it is reasonable to believe that the situation would naturally produce physical discomfort to persons of ordinary sensibilities, tastes and habits."); *Wernke v. Halas,* 600 N.E.2d 117, 120 (Ind.Ct.App.1992) (private nuisance action; "an otherwise lawful use may become a nuisance *per accidens* [nuisance in fact] by virtue of the circumstances surrounding the use"; determination of nuisance in fact "is a question for the jury or the judge as trier of fact" and is to be made "in light of all the surrounding facts and circumstances"; "the determination that something is a nuisance *per se* [nuisance at law] is a question of law for the court").

### V. Failure to Warn

IMPC's argument on this issue consists solely of the assertion that the Runges "failed to identify any level of EMF that would provide a rational basis for a warning." As mentioned earlier, a defendant must do more than simply allege that the plaintiff "has failed to produce evidence on each element" of his claim to prevail on a motion for summary judgment; rather, the defendant must "demonstrate the absence of any genuine issue of fact as to a determinative issue." *Jarboe,* 644 N.E.2d at 123. In reviewing the trial court's denial of IMPC's motion, we are required to "resolve any doubt as to any fact, or inference to be drawn therefrom, in favor of the non-moving party." *Landis,* 698 N.E.2d at 1220. Consequent-

ly, we may not determine that the Runges "have failed to establish any basis" for their claim that IMPC failed to warn them about EMF. *See South Eastern Indiana Natural Gas Co. v. Ingram,* 617 N.E.2d 943, 953 (Ind.Ct.App.1993) (duty to use due care "is the same for all relations, without regard to the facts of the case" and "includes the so-called duty to warn"; "[c]onsequently, if a duty to use due care exists, it is for the jury to consider the conditions and circumstances disclosed by the evidence and determine the actions, precautions, or course of conduct which should have been pursued in order to measure up to the duty which the law imposes.").[11]

### VI. Breach of Assumed Duty

Both IMPC and the Runges essentially "lump" their arguments regarding the validity of this claim with their arguments concerning failure to warn. This Court has discussed the fact-sensitive nature of the inquiry concerning the existence of an assumed duty:

A duty may ... be created by gratuitous or voluntary assumption[.] The assumption of a duty creates a special relationship between the parties and a corresponding duty to act in the manner of a reasonably prudent person[.] Whether a party assumed a duty and the extent of that duty are questions for the fact-finder[.] Similarly, whether a

---

11. IMPC argues that the failure-to-warn claim cannot succeed because the trial court ruled that IMPC's conduct was not the proximate cause of the Runges' medical injuries. IMPC has waived this argument by presenting it for the first time in its reply brief. *See Common Council of City of Hammond v. Matonovich,* 691 N.E.2d 1326, 1331 (Ind.Ct.App.1998), *trans. denied* ("A reply brief may not present new theories of appeal."). Moreover, the trial court also ruled that "the shocking sensation itself is an injury for which damages may be recoverable," thereby preserving both the injury element and the entire claim for jury consideration. Finally, we must distinguish between the duty of a public utility to warn its customers of reasonably foreseeable injuries that may occur as a result of the utility's conduct (as discussed in *Ingram, supra,* and as implicated in the instant case) and a manufacturer's duty to warn the users of its product of a concealed danger of which the manufacturer knew or had reason to know. *See, e.g., Jarrell v. Monsanto Co.,* 528 N.E.2d 1158, 1161 (Ind.Ct.App.1988), *trans. denied* (1990). The Runges originally framed their failure-to-warn claim in terms of a strict product-liability theory of failure to warn of a concealed danger. In its motion for summary judgment, IMPC argued that the Runges' failure-to-warn claim could not succeed because the trial court had dismissed their strict liability claim; citing *Ingram,* the Runges responded that "a duty to warn may be based on either strict liability or negligence."

party breached its duty is a factual question generally not appropriate for summary disposition[.]

*Gunter v. Village Pub,* 606 N.E.2d 1310, 1312 (Ind.Ct.App.1993). IMPC has failed to demonstrate the absence of a genuine issue of material fact with respect to these threshold considerations; accordingly, the trial court did not err in denying its motion for summary judgment on this claim.

## VII. Negligent Design, Construction, Maintenance, and Operation of Power Line

 IMPC asserts that it is entitled to summary judgment on the Runges' negligence claim because they did not provide "competent evidence that [IMPC] failed to exercise ordinary care." At the risk of sounding redundant, we reiterate that a plaintiff is required to come forward with contrary evidence only after a defendant "demonstrate[s] the absence of any genuine issue of fact as to a determinative issue." *Jarboe,* 644 N.E.2d at 123. Rather than attempting to meet this burden, IMPC has again contented itself with merely alleging that the Runges failed to designate sufficient evidence to proceed with their claims; unless and until IMPC can comply with Indiana's summary judgment standard, a jury must determine whether the Runges have satisfied the requisite burden of proof. *See Getche,* 701 N.E.2d at 874 ("Summary judgment should not be used as an abbreviated trial."); *see also Holding v. Indiana & Michigan Elec. Co.,* 400 N.E.2d 1154, 1158 (Ind. Ct.App.1980) ("Although Indiana does not adhere to the requirement that electric companies exercise utmost care in their use of high voltage electricity, our courts do hold them to a standard of care commensurate with the risks undertaken.").[12]

## VIII. Admissibility of Runges' Designated T.R. 56(C) Evidence

 Because we have determined that IMPC failed to meet its initial burden of demonstrating the absence of genuine issues of material fact in its motion for summary judgment on each of the above claims, we need not address its arguments concerning the admissibility of certain evidentiary items designated by the Runges in opposition to its motion pursuant to T.R. 56(C). *See Columbian Rope Co. v. Todd,* 631 N.E.2d 941, 945 (Ind.Ct.App.1994), *trans. dismissed* ("An error in the admission of evidence is not reversible unless it prejudices the complaining party's rights."); *see also Dorsett v. R.L. Carter, Inc.,* 702 N.E.2d 1126, 1127 (Ind.Ct.App. 1998), *trans. denied* (1999) ("The trial court may consider only evidence that can be admitted at trial in reaching a summary judgment determination.").

## IX. Admissibility of the Runges' Expert Scientific Testimony

### -and-

## X. Trial Court's Grant of Summary Judgment on the Runges' Claim that IMPC's Negligence Proximately Caused Adverse Health Effects

Because the salient questions involved in the consideration of these two issues are so closely interwoven, we choose to address them simultaneously. Upon examining IMPC's allegations of error regarding the testimony of the Runges' expert scientific witnesses, we observe that the challenged opinions of Dr. Stephen Smith ("Smith") relate specifically and those of Dr. Duane A. Dahlberg ("Dahlberg") relate more generally to the issue of medical

---

**12.** Because we hold that the trial court did not err in denying IMPC's motion for summary judgment on the Runges' negligence claim, we need not squarely address the parties' arguments on the applicability of *res ipsa loquitur,* which is "a rule of evidence which allows an inference of negligence to be drawn from certain surrounding facts." *Vogler v. Dominguez,* 624 N.E.2d 56, 61 (Ind.Ct.App. 1993), *trans. denied* (1994). We simply note that the question of "[w]hether the doctrine applies in any given negligence case is a mixed question of law and fact." *Id.*

causation: an issue on which the trial court granted IMPC's motion for summary judgment. Therefore, we are required to address the admissibility of their testimony on this issue in conjunction with the propriety of the trial court's ruling on the Runges' medical claims.[13]

Specifically, IMPC asserts that the testimony of the Runges' scientific experts "is not based on reliable scientific principles and should be excluded." The Runges counter that the challenged testimony is "based upon years of experience in investigating the effects of [EMF] and review of published journal articles, rather than being based on any one given methodology or principle." Both parties rely heavily upon the U.S. Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) in formulating their arguments regarding the determination of scientific reliability and the admissibility of expert testimony under Ind. Evidence Rule 702.

With respect to the testimony of Gerald Bodman ("Bodman"), who was retained by the Runges to measure voltage and current levels on their property in October 1990, we shall address the admissibility of his testimony below in our discussion of expert scientific testimony and Evid. R. 702. As for the testimony of Drs. Bruce McLeod ("McLeod") and Abraham Liboff ("Liboff"), we note that the Runges stated their opinions were limited "to establish[ing] the reasonableness and extent of the fear and emotional distress suffered by the Runges in being exposed to the excessive electric and magnetic fields on their property." Therefore, we shall review the admissibility of their testimony below in the context of its limited application.[14]

We reiterate that the trial court's summary judgment ruling is "clothed with a presumption of validity," and we will "affirm a grant of summary judgment if it is sustainable on any theory or basis found in the record." *Getche,* 701 N.E.2d at 874.

In support of its motion for summary judgment, IMPC excerpted deposition testimony from several of the Runges' witnesses to show that they failed to "present competent evidence" that IMPC's conduct "was both the cause-in-fact and the proximate cause" of the Runges' alleged injuries. As this Court stated in *Roberson v. Hicks,* 694 N.E.2d 1161, 1163 (Ind.Ct.App.1998), *trans. denied,* "[a]n essential element in a cause of action for negligence is the requirement of a reasonable connection between a defendant's conduct and the damages which the plaintiff has suffered." At a minimum, this element requires causation in fact—"that is, that the harm would not have occurred 'but for' the defendant's conduct." *Id.* The plaintiff may not carry his burden with "evidence based merely upon supposition or speculation." *Id.* "When the issue of cause is not within the understanding of a lay person, expert witness testimony on the issue is necessary." *Id.* Although "summary judgment is rarely appropriate in negligence actions ... a defendant is entitled to judgment as [a] matter of law when undisputed material facts negate at least one element of plaintiff's claim." *Colen v. Pride Vending Service,* 654 N.E.2d 1159, 1162 (Ind.Ct.App.1995), *trans. denied*

13. As the trial court perceptively noted in its denial of IMPC's motion to exclude expert testimony, "upon granting Defendant's Motion for Summary Judgment on the medical claims presented by the Plaintiff ... much of the expert testimony argued about by the parties becomes irrelevant." Nevertheless, because a review of Smith's and Dahlberg's testimony is indispensable to our review of the trial court's grant of summary judgment on the Runges' medical claims, we must determine its admissibility despite its possible lack of relevancy.

14. We note that the Runges' amended complaint does not contain a specific claim for emotional distress; in reviewing the record and the parties' briefs, we can only conclude that the trial court's and the Runges' references to an emotional distress claim apply strictly to the damage element of the negligence claim.

(1996). More specifically, "[t]he defendant is entitled to summary judgment where the plaintiff cannot establish that her injuries were proximately caused by the defendant's conduct." *Hottinger v. Trugreen Corp.*, 665 N.E.2d 593, 595–596 (Ind.Ct. App.1996), *trans. denied.*

■ IMPC designated testimony from the Runges' internists, obstetrician/gynecologist, dermatologist, dentist, and neurosurgeons, all of whom stated that they did not diagnose EMF as the cause of the Runges' various medical complaints, which included rashes, headaches, tooth decay, and Tina's miscarriage. IMPC also presented testimony from Dahlberg, McLeod, Liboff, and Smith, none of whom is a medical doctor, and none of whom has examined the Runges or their medical records or interviewed their treating physicians. In the extracts selected from their depositions, IMPC attempted to show that none of these experts could offer an opinion that EMF actually caused the injuries claimed by the Runges. In its ruling on IMPC's motion for summary judgment, the trial court stated, "That there is no genuine issue of material fact, and there is no showing of proximate cause related to the claimed negligence of the Defendant and [injuries claimed by the Runges] or any other medical related condition, and Summary Judgment on those claims shall be GRANTED."

The Runges seem to suggest that because the trial court "found a genuine issue of material fact with respect to every other facet of [their] negligence claim," it therefore erred in granting summary judgment on the issue of causation of their medically related conditions. Citing *Jarboe*, the Runges assert that the "[t]he trial court failed to recognize that [they] had no obligation to come forward with any evidence to establish a genuine issue of material fact with respect to the existence of the injuries or the causation until the moving party demonstrated the absence of a material fact"; they further claim that the

evidence designated by IMPC "was insufficient to carry this burden." We disagree.

■ Without exception, the Runges' treating physicians stated that they did not diagnose EMF as the cause of any of the adverse health effects of which the Runges complained. The most equivocal opinion was offered by Dr. Claude Hartman, Tina's OB/GYN, who answered that he "[did not] know" whether exposure to EMF had caused Tina's miscarriage, and that he had not previously diagnosed EMF as a cause of anyone else's miscarriage. In their memorandum in opposition to IMPC's motion to exclude expert testimony, the Runges stated that "the opinions of Dr. Liboff and Dr. McLeod are not being used to establish causation, but to establish the reasonableness and extent of the fear and emotional distress suffered by the Runges in being exposed to the excessive electric and magnetic fields on their property." Having admitted to the limited purpose of Liboff's and McLeod's testimony, the Runges relied on the opinions of Smith, who has a Ph.D. in anatomy but does not have a medical degree.

In support of their motion for summary judgment, IMPC cited portions of Smith's deposition to cast doubt on the admissibility of his opinions: [15]

Q Do you feel that you're in a position to identify all of the risk factors that have been associated with miscarriage?

A *Oh, certainly not.* Not every one. New ones appear weekly.

Q Have you made any investigation of whether any of these risk factors were present in the Runges' environment?

A *No, except electrical and magnetic fields.* That's information that's been supplied to me.

Q So to your knowledge there may well have been other risk factors

---

15. Smith's answers are indicated by "A."

Q that Mrs. and/or Mr. Runge were exposed to?

A *I have no knowledge of other factors.*

Q Either way?

A *Either way . . . .*

Q Now, are you aware of any research that identifies the operative windows of magnetic field exposure for a miscarriage?

A I haven't made a systematic study of it.

Q So the answer is no?

A [My] answer is I don't know if there are such windows and specifically which ones there are if they exist. I could give you some statements about what general frequencies tend to be active and that sort of thing . . . .

Q Are you offering an opinion in this case that electric and/or magnetic fields from the power line over the Runges' property caused Mr. Runge to have headaches?

A *No.*

Q Are you offering an opinion that they contributed to his having headaches?

A I'm offering the opinion that *there's a strong probability* that they contributed . . . .

Q And by strong probability what do you mean?

A I believe that there's a greater than 50 percent chance that either the effects directly or the downstream effects may have caused Mr. Runge's headaches . . . .

Q What level of external magnetic field would be required to cause the internal effects that would lead to a headache?

A If you're talking about the electrical fields to produce that kind of thing, this resultant electrical field, I would assume a magnetic field in the neighborhood of 150 or so milligauss.

Q What level of external electric field would be required to cause the internal effects that would lead to a headache?

A *I've already said I don't know in their case . . . .*

Q Is it your opinion that electric and/or magnetic fields from the power line over the Runges' property caused sleeplessness?

A It certainly can.

Q Well, I'm asking you is it your opinion that it did?

A I'm offering you an opinion that *there's a good probability* that it did.

Q What other medical conditions, illnesses or physical problems is it your opinion that the power line over the Runges' property caused? . . .

A *Since I don't know the full range and spectrum of what the Runges suffered I really can't answer that question.* As far as I know there was the business that they were nervous and depressed and sleepless and that they had some headaches. Ms. Runge lost a baby and I think Mr. Runge suffered some rashes? I have no way of making a judgment about rashes. *That's the kind of thing I don't there's any—I am not aware of any research that deals with that, dermatological effects.*

Q Other than the rash is it your opinion that electric and/or magnetic fields from the power line over the Runge property caused these other conditions?

A I think *there's a very good probability* that they contributed significantly . . . .

Q Did you take into account other risk factors for headaches?

A *Well, since I was specifically asked to look at electric and magnetic field factors I didn't look at the other stuff.*

Q So you have no knowledge whether or not there were other risk factors involved?

A *No, I don't.*

Q And you did not eliminate any other potential contributing factors?

A *No, certainly not. . . .*

Q Do you consider yourself an expert in sleeplessness?

A *No, not at all. It's not my area. . . .*

Q And you did not—

A I have not made a systematic—

Q —eliminate other contributing factors in this instance, did you?

A *Oh, certainly not. If you're asking me is this the sole factor which contributed to Mr. Runge's headaches I couldn't tell you.*

Q Can you tell me whether any other factor was a more significant contributor?

A *No, because I don't know the Runges' family history, their lifestyle. I don't know any of those things.*

Q So you can't eliminate the possibility that there was some other factor that was a much more significant contributing factor?

A *Certainly not. And you also cannot eliminate the possibility that the factors were additive.*

Q And that would be the same for the electric and magnetic fields and the miscarriage?

A Absolutely.

Q And that would be the same for the electric and magnetic fields and sleeplessness?

A Yes.

Q And nervousness?

A Absolutely.

Q And any other experience the Runges claim they experienced in that property?

A Rashes, boils on their ears, anything. . . .

Q Are there any other conditions that in your opinion the Runges experienced as a result of electric and/or magnetic fields? . . .

A *The answer is I don't know because I don't know the complete history of the Runges.*

Q You have not reviewed their medical history?

A *No.* No, only that little [précis] that was provided in association with the first deposition. I think it's called a family history of the Runges or something like that. I don't have it at hand. . . .

(Emphases supplied.)

 In their appellate briefs, the parties engage in a spirited debate about the admissibility of scientific expert testimony under Evid. R. 702, but we first resort to the cornerstone rules of evidence concerning admissibility. Ind. Evidence Rule 401 states that " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 402 reads in relevant part, "Evidence which is not relevant is not admissible." "Standing alone, evidence establishing a mere possibility of cause or which lacks reasonable certainty or probability is not sufficient evidence by itself to support a verdict." *Daub v. Daub,* 629 N.E.2d 873, 877 (Ind.Ct.App.1994), *trans. denied.* "Civil liability may not be predicated purely upon speculation." *Id.* Regardless of whether Smith is sufficiently qualified to offer expert opinions under Evid. R. 702, his deposition casts serious doubt upon the relevance of his opinions to the issue of medical causation and the facts in issue in this case. "Negligence cannot be established by inferential speculation alone." *Colen,* 654 N.E.2d at 1163. "An expert's opinion that something is 'possible' or 'could have been' is insufficient by

itself to support a material factual question." *Id.*[16]

In the context of Evid. R. 401 and 402, we cannot conclude that Smith's testimony regarding the possible effects of EMF on the Runges' health is relevant to the determination of causation, in that his failure both to examine the medical conditions and histories of the Runges and to rule out other contributing factors cannot ultimately help the Runges prove that their adverse health effects were more or less probably caused by IMPC's alleged negligence. *See Tucker v. Nike*, 919 F.Supp. 1192, 1196–1197 (N.D.Ind.1995):

> The most troubling aspect of [plaintiff's expert's] testimony [on causation] is his failure to consider other causes of the accident in forming his opinion.... [Plaintiff's expert's] testimony provides no scientific basis for excluding these other factors as potential causes for the Plaintiff's injury. Had [the expert] even considered these other factors, he could have conducted tests or at least arrived at a scientific explanation for why these other factors were not the cause of the injury in this case. The Court finds that [the expert's] opinion as to the cause of the Plaintiff's accident is nothing more than "subjective belief" and "unsupported speculation" which is not the proper subject of expert testimony under *Daubert* [.]

> The expert's opinion on causation also implicates *Daubert's* second requirement of "fit." Under that requirement, the expert's opinion must have a "scientific connection" to the facts of the case. In addition to [the expert's] speculation as to the cause of the accident in this case, the Court finds that his opinion does not "fit" the facts of this case.

The question of "fit" is especially apposite with respect to the causation of Raymond's headaches, where Smith opined that the strength of a magnetic field would have to be "in the neighborhood of 150 or so milligauss"; as IMPC observes, this level of magnetic field intensity is many times higher than the highest reading that had been measured on the Runges' property.

■■■ With respect to the admissibility of expert scientific testimony, we first refer to Ind. Evid. Rule 702:

### Rule 702. Testimony by Experts

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education,

---

**16.** *Cf. Roberson*, 694 N.E.2d at 1163 (quoting *Noblesville Casting Div. of TRW, Inc. v. Prince*, 438 N.E.2d 722, 731 (Ind.1982)) ("However, 'an expert's opinion that something is 'possible' or 'could have been' may be sufficient to sustain a verdict or award' when rendered in conjunction with other, probative evidence establishing the material factual question to be proved."). In reviewing Smith's deposition, it is obvious that he was not familiar with the EMF levels measured on the Runges' property or with any predisposing health factors the Runges might have had that could have contributed to their alleged injuries. Smith does nothing more than offer general opinions based on questionable scientific foundations and fails to apply his expertise to the facts of the case at bar. As for the Runges' claim that they are competent to testify about causation "based on their own experience," we note that the mere temporal congruity of their residence in the house and their alleged injuries is insufficient to establish causation. *See*

*Daub*, 629 N.E.2d at 878 (in absence of "application of scientific principles" by a scientific expert to the facts of her case, plaintiff's "lay report of the facts which she experienced first-hand amounts to nothing more than her own hypothesis that her back ailment was caused by the slip. Alone, [plaintiff] has established nothing more than the facts which make up her allegation."); *Porter v. Whitehall Laboratories, Inc.*, 791 F.Supp. 1335, 1341–1342 (S.D.Ind.1992) (*Porter I*), aff'd 9 F.3d 607 (7th Cir.1993) (*Porter II*):

> Such a blunt inference cannot provide a reasonably reliable explanation for complex, unseen physiological processes. While a temporal congruity may be some evidence of causation, it is insufficient evidence to move the merely possible to the reasonably probable. Any finding of the fact of causation based solely on the facts within the understanding of lay jurors would be bald speculation.

may testify thereto in the form of an opinion or otherwise.

**(b)** Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

The federal rules of evidence do not have a counterpart to Evid. R. 702(b), which was adopted before the U.S. Supreme Court's decision in *Daubert*, which in turn addressed the trial court's " 'gatekeeping function' of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Hottinger*, 665 N.E.2d at 596 (citing *Daubert*, 509 U.S. at 596, 597, 113 S.Ct. at 2798, 2799, 125 L.Ed.2d at 485). Our supreme court has held that "the federal evidence law of [*Daubert* ] and its progeny are helpful in applying Indiana's Evid. R. 702." *Hottinger*, 665 N.E.2d at 596 (citing *Steward v. State*, 652 N.E.2d 490, 498 (Ind. 1995)). "The trial court's determination regarding the admissibility of expert testimony under Evid. R. 702 is a matter within its broad discretion which will not be disturbed unless the trial court's application of the *Daubert* framework is clearly erroneous." *Hottinger*, 665 N.E.2d at 596.

■ "When faced with a proffer of expert scientific testimony, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can be applied to the facts in issue." *Id.* In the instant case, the trial court held separate hearings on IMPC's motion for summary judgment and motion to exclude expert testimony, the latter of which contained numerous references to the various reliability factors enumerated in *Daubert*, such as whether a theory or technique can be empirically tested; whether the theory or technique "has been subjected to peer review and publication"; and whether the theory or technique has gained "widespread acceptance." *Id.*

■ As we concluded in our discussion of relevancy under Evid. R. 401 and 402, we fail to see how Smith's testimony could "assist the trier of fact to understand the evidence or to determine a fact in issue" with respect to the issue of causation under Evid. R. 702(a). Relevancy considerations aside, the Runges defend the testimony of Smith and their other witnesses as "based upon years of experience in investigating the effects of electric and magnetic fields and review of published journal articles, rather than being based on any one given methodology or principle." Although we agree with the Runges that no specific "test" or set of "prongs" must be considered to determine the reliability of scientific testimony, we also agree with IMPC that allowing a self-professed expert to base his opinions merely upon his "years of experience" would be "inconsistent with the clear intent of [Evid. R. 702] that scientific experts demonstrate their testimony is based on reliable scientific principles." *See Lytle v. Ford Motor Co.*, 696 N.E.2d 465, 473 (Ind.Ct.App.1998), *trans. denied* (1999) (flexibility of Evid. R. 702 analysis).[17]

**17.** Both parties implore this Court to address the question of whether a scientific expert may base his opinion solely upon her "knowledge, training and experience." Although we need not analyze this question exhaustively because of the factual and procedural complexion of this case, we note that Ind. Evid. R. 702(b) states that "[e]xpert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable." When viewed in conjunction with such *Daubert* reliability criteria as empirical testing, peer review and publication, and widespread acceptance of a theory or technique, it is obvious that a trial court is required to determine whether "an expert's testimony [ ] rests on a *reliable foundation* " and "whether the *reasoning or methodology underlying the testimony* is scientifically valid." *Hottinger*, 665 N.E.2d at 596 (emphases supplied). Although the Runges are correct that Indiana's approach to determining the scientific reliability of an expert's opinions is a flexible one, we remind them that "[a]n expert cannot rely solely on his or her own stature, intellect or intuition to support an opinion admissible to aid the trier of fact." *Porter I*, 791 F.Supp. at 1345.

In *Porter v. Whitehall Laboratories, Inc.*, 791 F.Supp. 1335 (S.D.Ind.1992) (*Porter I*), aff'd 9 F.3d 607 (7th Cir.1993) (*Porter II*), Judge Tinder cautioned against the inherent dangers of permitting a jury to rely on the bald assertions of an expert:

Merely because an opinion of scientific causation comes from a person learned in medical science does not provide that opinion with a sufficient scientific basis. An expert cannot rely solely on his or her own stature, intellect or intuition to support an opinion admissible to aid the trier of fact. *The basis—the "reasoning" and "facts and data"—of an opinion is distinct from the expert's qualifications as an expert in the field. An expert's qualifications reflect the expert's knowledge of relevant scientific facts and skill in making comparative judgments. The factual basis of a particular medical conclusion is composed of an application of particular scientific facts to particular data about the instant case. Admissible opinions relate instant facts to known relationships; an opinion relating instant facts to an unknown relationship (a hypothesis) does not further the trier of fact's ability to determine a fact dependent upon that hypothetical relationship. Although experts may provide opinions in the form of a hypothetical fact situation, the scientific foundation or reasoning process may not be based on merely hypothetical causal relationships. Unsupported subjective opinion is unhelpful speculation and not admissible under Rule 702 . . . .*

In a highly technical case like this, where a lay trier of fact cannot possibly determine the precise etiology of the injury without guidance from expert opinions, there is a risk that the jury would make an irrational finding of causation based upon the siren-like allure of opinions stated by highly qualified experts. *Thus, an expert's opinion must have some basis other than hypothesis before the opinion may have the privilege of being assailed by cross-examination.*

*Id.* at 1345 (emphases supplied). Unlike the Runges' treating physicians, all of whom stated that they did not diagnose EMF as the cause of the Runges' alleged injuries, Smith lacks both a medical degree and detailed knowledge of their current medical conditions and past medical histories, which would form the critical factual basis for his expert opinions. As we stated in *Hottinger*, "[e]xpert testimony requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." 665 N.E.2d at 596. IMPC successfully demonstrated that Smith's testimony (and therefore the Runges' claim) fails to meet this standard with respect to causation, and the trial court correctly determined that IMPC thereby demonstrated the absence of a genuine issue of material fact.

In their response to IMPC's summary judgment motion, the Runges designated abundant supporting evidence, including the following excerpts from Smith's deposition on June 13, 1997:

Q Absent information of other contributing risks would exposure to electric or magnetic fields be a probable cause of headache?

A Yes.

Q Absent information of other contributory risks would exposure to electric or magnetic fields be a probable cause of miscarriage?

[Objection]

A Could be, certainly.

Q Absent information of other contributing risks would exposure to electric and magnetic fields be a probable cause of sleeplessness?

[Objection]

A Yes.

Q Same question with memory loss?

A Less definite but possible.

Q What about absent other information of other contributing risks,

would exposure to electric and magnetic fields be a probable cause of depression?

[Objection]

A That's in the same category. That's less probable, at least less definite.

Q How about the same question with respect to nervousness?

[Objection]

A That's back up there, I think, with the other ones. That's quite probable.

Q Now, you answered some questions with regard to stressors. Can stress lead directly to miscarriage in your opinion?

[Objection]

A It certainly is reported to be a cause of fetal wastage in the literature.

With Smith's failure to account for other possible contributing factors to the Runges' alleged injuries, and with his failure to particularize his opinions to reflect the facts of the case at bar, we cannot find that the Runges met their burden of demonstrating the existence of a genuine issue of material fact regarding causation of their alleged injuries. Because we hold that Smith's testimony was not relevant under Evid. R. 401 and would not "assist the trier of fact to understand the evidence or to determine a fact in issue" under Evid. R. 702(a), we need not address the parties' arguments regarding the scientific reliability of his opinions in the context of *Daubert.*

We also find that the same insuperable problems of relevancy and speculation are present in Dahlberg's testimony with respect to medical causation, given that he does not have a medical degree or any medical training; has neither reviewed the Runges' medical records nor spoken with their treating physicians; has not conducted an independent evaluation of whether "possibly severe health risks" actually existed on the Runges' property; and has stated that "we do not know all the questions to ask or maybe even all the parameters to measure in order to determine cause and effect" regarding EMF. Indeed, upon reviewing the designated excerpts from Dahlberg's deposition, we are more firmly convinced of the sagacity of Judge Tinder's admonitions regarding the perils of allowing an "expert" witness to testify on the basis of "his or her own stature, intellect or intuition." *Porter I,* 791 F.Supp. at 1345. Finally, because we hold that Smith's and Dahlberg's testimony on the issue of causation is inadmissible, we must reverse the trial court's ruling on IMPC's motion to exclude it.

■ As for the testimony of McLeod, an electrical engineer, and Liboff, a physicist, we note that IMPC's appellate arguments focus on its admissibility on the issue of medical causation and not with respect to its limited purpose of "establish[ing] the reasonableness and extent of the fear and emotional distress suffered by the Runges in being exposed" to "excessive" EMF on their property. Nevertheless, McLeod admitted in his deposition that "[w]e can neither prove [ ][n]or disprove" that "power frequency fields" cause health problems in humans, and Liboff confirmed that he was not "offering an opinion that [EMF from the power line] actually contributed to any injury or illness claimed by the Runges." Moreover, neither McLeod nor Liboff has ever reviewed the Runges' medical records or spoken with their treating physicians. Because IMPC failed to argue that their testimony was inadmissible on the issue of emotional distress relating to the Runges' negligence claim, we may not determine its admissibility for this limited purpose. Finally, because we cannot predict how McLeod's and Liboff's testimony will be used by the Runges to support their negligence claim, we can do nothing more than remind the trial court of its "gatekeeping" responsibility and the relevancy and reliability considerations addressed in the evidence rules and case law cited above.

Finally, with respect to Bodman's testimony regarding his measurement of electric current on the Runges' property, neither party sufficiently informs us of the intended purpose for the challenged testimony, and IMPC has failed to demonstrate how it was prejudiced by the trial court's admission thereof at the summary judgment stage. Consequently, we decline IMPC's invitation to second-guess the trial court's determination of its admissibility.

In summary, the trial court did not err in granting IMPC's motion for summary judgment on the issue of causation of the Runges' adverse health effects; however, we reverse the trial court's denial of IMPC's motion to exclude the expert scientific testimony of Smith and Dahlberg.

### XI. Trial Court's Denial of the Runges' Motion to Strike Dillman's Affidavit

### -and-

### XII. Trial Court's Grant of IMPC's Motion to Strike Portions of Tina's Deposition

As with IMPC's evidentiary objections, our affirmation of the trial court's rulings on the motion for summary judgment obviates the need to address the similar issues raised by the Runges on cross-appeal.

### Conclusion

For the aforementioned reasons, the judgment of the trial court is affirmed in part and is reversed in part only with respect to the denial of IMPC's motion to exclude the expert scientific testimony of Smith and Dahlberg. We remand this cause to the trial court for further proceedings consistent with this opinion.

KIRSCH and DARDEN, JJ., concur.